## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In Re: | ) | **CASE NO. 15-54748** |
| | ) | |
| **FRED MILANI,** | ) | **CHAPTER 7** |
| | ) | |
| Debtor. | ) | **JUDGE LISA RITCHEY CRAIG** |
| **FRED MILANI,** | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | **CONTESTED MATTER** |
| | ) | **MOTION FOR CONTEMPT** |
| **FXM, P.C. D/B/A FRANK X. MOORE** | ) | **DISCHARGE VIOLATION** |
| **LAW and FRANCIS X. MOORE,** | ) | |
| Respondents. | ) | |

---

# RESPONDENTS' MOTION FOR CONTEMPT,
# TO COMPEL DISCOVERY & FOR SANCTIONS

---

Francis X. Moore, Esq.
Georgia Bar No. 519120
**Frank X. Moore Law**
730 E 2d Street, Suite 106
Blue Ridge, Georgia 30513
(706) 851-7946
fmoore@fxm-law.com

Counsel for Respondents

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Summary: Discovery Issues, Violations & Remedies Requested . . . . . . . . . . . . . | 4 |
| | A. | 2017 DeKalb Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| | B. | Milani's Arguments that Claims in the 2017 DeKalb Lawsuit Violate his Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | C. | Respondents' Defenses to Motion for Contempt - Generally . . . . . . . . . . | 6 |
| | D. | The Importance of Allowing Respondents to Obtain Discovery. . . . . . . . . | 6 |
| | E. | The Remedies Sought in this Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| | | |
| II. | Fee Earned, Lien Filed, and a Conspiracy is Conceived and Implemented . . . . . . | 7 |
| | A. | FXM Represents Milani and His LLCs in Lender Collection Litigation. . . | 7 |
| | B. | FXM Asserts Lender Liability Claims & Negotiates Favorable Settlement | 8 |
| | C. | Milani Refuses to Pay, so FXM Files Lien Against Lake Lanier Property | 8 |
| | D. | Milani and Others Conspire to Defeat the FXM Lien . . . . . . . . . . . . . . . . | 9 |
| | | 1. Events between September 30, 2013 and December 31, 2013 . . . . . | 9 |
| | | 2. Events between January 1, 2014 and July 31, 2014 . . . . . . . . . . . . . | 11 |
| | | |
| III. | 2014 DeKalb Lawsuit is Filed & Milani Files 3rd Bankruptcy . . . . . . . . . . . . . . . . | 14 |
| | | |
| IV. | 2017 DeKalb Lawsuit is Filed & Milani Re-Opens Bankruptcy . . . . . . . . . . . . . | 15 |
| | A. | The Complaint is Filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| | B. | Xiangtong Lu - Milani's Fixer: The White House. . . . . . . . . . . . . . . . . . . . | 16 |
| | C. | Xiangtong Lu - Milani's Fixer: The Church Property. . . . . . . . . . . . . . . . . | 19 |
| | D. | Xiangtong Lu - Milani's Fixer: 662 Bayshore Drive. . . . . . . . . . . . . . . . . . | 20 |
| | E. | Xiangtong Lu - Milani's Fixer: Lake Lanier Property. . . . . . . . . . . . . . . . . | 20 |
| | F. | Allegations in Complaint Include Milani Conduct After March 12, 2015 . | 21 |
| | G. | Discharge Injunction Violations Require Clear and Convincing Evidence | 29 |
| | H. | Milani Intentionally Defaults & Re-Opens This Case . . . . . . . . . . . . . . . . | 29 |
| | I. | Milani Admits That the Lake Lanier Property is his "After Acquired Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| | | |
| V. | What is the Conspiracy & How to Prove Milani Participated After March 12, 2015? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 |
| | A. | Milani Contends that FXM Fails to Allege Any Post-Petition Acts. . . . . . | 34 |
| | B. | The Law of Conspiracy & the Bankruptcy Doctrine of "Returning to the Fray" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
| | C. | How to Prove a Co-Conspirator's Participation . . . . . . . . . . . . . . . . . . . . | 39 |

| | | | |
|---|---|---|---|
| VI. | | Obstruction of Discovery in 2017 DeKalb Lawsuit by Milani & Lu Defendants. . | 40 |
| | A. | Milani's Extensive Office, Administrative and Professional Services Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| | B. | FXM's Discovery in 2017 DeKalb Lawsuit . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| | C. | Milani Obstructs Discovery in the 2017 DeKalb Lawsuit. . . . . . . . . . . . . | 43 |
| | D. | X-Lu and Diamond Island Also Obstruct Discovery in the 2017 DeKalb Lawsuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| VII. | | Milani's Discovery Abuses Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| | A. | FXM's Efforts to Obtain Information & Documents . . . . . . . . . . . . . . . . | 53 |
| | B. | Milani's Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| | C. | Milani's Responses to Written Discovery & Single Piece of Paper Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
| | D. | New Counsel Fails to Cause a Change in the Milani Discovery M.O. . . . . | 57 |
| | | 1. No After Acquired Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
| | | 2. Milani's Ownership Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
| | | 3. Persons with Knowledge or Information. . . . . . . . . . . . . . . . . . . . . | 63 |
| | | 4. After-Acquired Property Relating to MHB Homes and Portofino . . | 65 |
| | | 5. Agreements Milani Entered Into After June 1, 2013 . . . . . . . . . . . | 69 |
| | | 6. Communications With PNC Bank, RBC and Other Co-Conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 |
| | | 7. Milani's Parsimonious Production of Paper . . . . . . . . . . . . . . . . . | 77 |
| | | 8. The Do-Over of Milani's Deposition . . . . . . . . . . . . . . . . . . . . . . . | 78 |
| VIII. | | Milani's False Testimony & Discovery Responses. . . . . . . . . . . . . . . . . . . | 79 |
| | A. | Serial Filer - Serial Perjury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
| | | 1. Milani's First Bankruptcy Filing . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
| | | 2. Milani's Second Bankruptcy Filing . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| | | 3. Milani's Third Bankruptcy Filing (This Case) . . . . . . . . . . . . . . . | 81 |
| | B. | Milani's Ability to Accumulate "After-Acquired Property" on $50k Annual Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 83 |
| | | 1. 2267 Echo Trail - $1.3 Million . . . . . . . . . . . . . . . . . . . . . . . . . . | 83 |
| | | 2. Bayshore Home - $640k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 |
| | C. | Milani's Involvement in Portofino 2.0 (the 2017 Version) . . . . . . . . . . . . | 86 |
| | D. | Milani Committed Perjury in Denying he Does Business with X-Lu . . . . . | 87 |
| IX. | | Argument & Citation to Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89 |
| | A. | This Court's Contempt Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89 |
| | B. | Milani Should be Compelled to Provide Discovery . . . . . . . . . . . . . . . . . | 92 |
| | C. | Milani Should Be Made to Appear Again For his Deposition. . . . . . . . . . . | 93 |
| | D. | Respondents Are Entitled to Recover Costs and Expense for Filing this Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93 |
| X. | | Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94 |

Pursuant to 11 U.S.C. §105, 28 U.S.C. §1927, and Fed. R. Bankr. P. 7037 made applicable to these proceedings by Fed. R. Bankr. P. 9014, Respondents FXM, P.C. d/b/a Frank X. Moore Law ("FXM") and Francis X. Moore ("Moore" who, together with FXM, are collectively referred to herein as the "Respondents") file this motion seeking an order: **(A)** holding Debtor **Fred Milani** ("Debtor" or "Milani") and his counsel **Charles W. Clapp** in contempt of court based on the perjury Milani committed in his deposition, the patently false responses he gave under oath to interrogatories, and the obstruction and suborning of perjury by Clapp at Milani's deposition; **(B)** compelling Milani to *(1)* provide full and complete responses to the written discovery served on him in this case, *(2)* produce all of the documents requested by Respondents, and *(3)* appear again for his deposition, **(C)** awarding fees and costs to Respondents; and **(D)** granting such other and further relief is just and proper.

**I.  Summary: Discovery Issues, Violations & Remedies Requested**

**A.    2017 DeKalb Lawsuit**

On September 28, 2017, FXM filed a lawsuit against Fred Milani and others relating to an attorney lien on 222 Acres of property on Lake Lanier that was filed on October 10, 2013 when Milani and his alter-ego limited liability companies refused the pay an amount Milani and his entities have admitted to be a nearly $5 million fee.  In the 2017 lawsuit, FXM acknowledged that, upon being sued by FXM in late 2014 and right after he was served, Milani filed this Chapter 7 bankruptcy case on March 12, 2015 and obtained a discharge.

FXM, however, further alleged in its 2017 lawsuit that after March 12, 2015, Milani continued or re-joined the conspiracy he started pre-bankruptcy and now owns or controls, through Diamond Island, LLC, virtually all of the 222 Acres.  In the lawsuit, FXM sought an equitable decree granting

it a priority lien on the 222 Acres of property with the right to foreclose that lien to recover its unpaid

fee (i.e. an *in rem* remedy). FXM also sought to recover damages from Milani under several counts,

all of which included the following caveat:

> [FXM] has named Milani as a defendant solely for the purpose of recovering damages
> and obtaining relief for Milani's conduct, transactions or occurrences after March 12,
> 2015 or for **any conspiracy that he joined in, continued, or ratified on and after
> March 12, 2015 to the fullest extent permitted under applicable bankruptcy and
> Georgia law**.

[Dkt#55-1, p47, ¶200].

**B.    Milani's Arguments that Claims in the 2017 DeKalb Lawsuit Violate his Discharge**

Now contending that the filing of the lawsuit was a violation of his discharge and, therefore,

void *ab initio*, Milani and several of his alter-ego entities contend they had no duty whatsoever to

timely file any answers or otherwise appear and, on that theory, they all purposely and intentionally

went into default and refused to respond to the written discovery served on them with the lawsuit.

To protect himself from the 2017 lawsuit (i.e. oust the jurisdiction of the DeKalb Superior Court),

to buy time, and to distract and exhaust FXM and its owner, Milani successfully moved *ex parte* to

re-open this case, filed a motion to hold Respondents in contempt for alleged violations of his

discharge injunction, and paid $50,000 to hire Balch & Bingham which sought and obtained a

protective order preventing any discovery from Milani until after this Court has ruled on Milani's

motion for contempt.

According to Milani, caveats like the one cited above (Complaint ¶200) appearing in each

count seeking damages in the complaint filed in 2017 in DeKalb Superior Court were mere boiler

plate language that hid FXM's true intent to seek to recover on a debt that was discharged in this

case. Milani has fleshed this argument out by making the following allegations regarding FXM's

complaint: **(a)** it is "based upon actions that primarily took place between on (sic) 2008 and 2014

[i.e. pre-bankruptcy];" **(b)** "the complaint fails to allege any specific actions by Debtor on or after March 12, 2015;" **(c)** "there are no facts set forth in the Complaint about Milani's alleged post-petition acts to 'participate, ratify, and gain the benefit of' the alleged pre-petition conspiracy;" and **(d)** "[t]he reason is that there were no such post-petition acts committed by Milani."

**C.    Respondents' Defenses to Motion for Contempt - Generally**

Respondents deny that they violated Milani's discharge injunction. They also deny that the Complaint only includes acts taken by Milani prior to the filing of this bankruptcy case, and point to numerous allegations that - at the very least - generally recite Milani's continued participation in and rejoining of the conspiracy after March 12, 2015. Of course the most poignant post-bankruptcy act by Milani as alleged in the complaint is his present day control or ownership of the 222 Acres. Indeed, as described below are detailed admissions made by Milani as to his ownership of the 222 Acres - not because he cheated FXM - but only because he acquired them after filing bankruptcy.

**D.    The Importance of Allowing Respondents to Obtain Discovery**

Importantly, while Milani must establish a violation of his discharge by clear and convincing evidence, FXM has and accepts the responsibility to marshal proof of Milani's specific acts taken after March 12, 2015 to re-join or continue the conspiracy he started in October 2013. With that in mind and with discovery at a stand-still in the 2017 DeKalb Lawsuit, Respondents served written discovery on Milani in this case and also took a deposition on February 20, 2018. Below, Respondents describe in detail the efforts they have made to obtain discoverable informatioin and the obstreperous and contumacious conduct of Milani and his former attorney, Charles M. Clapp, the methods and results of which have continued under the representation by Milani by his new attorney, Anna M. Humnicky. Attention is also brought to the virtually identical obstreperous and

contumacious behavior of two of Milani's co-conspirators and named defendants in the 2017 DeKalb Lawsuit, Xiangtong Lu and Diamond Island, LLC.

**E.      The Remedies Sought in this Motion**

Understanding full well, their high burden of proof, Respondents have presented detailed information, facts and legal authority below which justify findings of contempt and the sanctioning of Milani and at least one of his attorneys.    Likewise, Respondents have presented detailed information, facts and legal authority justifying an order compelling Milani to: *(1)* provide full and complete responses to the written discovery served on him in this case, *(2)* produce all of the documents requested by Respondents, and *(3)* appear again for his deposition. Finally, Respondents ask for an award of fees and costs to Respondents and such other and further relief is just and proper.

**II. Fee Earned, Lien Filed, and a Conspiracy is Conceived and Implemented**

**A.      FXM Represents Milani and His LLCs in Lender Collection Litigation**

In a written contingent fee engagement letter effective <u>October 1, 2011</u>, Milani hired FXM to defend him and two of his entities, Portofino at Lake Lanier, LLC ("Portofino") and MHB Homes, LLC ("MHB Homes") in debt collection litigation involving what came to be over $15 million in loans secured by approximately 187 of the 221 acres owned by Portofino, MHB Homes or Hadi Homes, Inc. ("Hadi Homes" which, together with Milani, MHB Homes and Portofino are collectively referred to as the "Milani Parties") in Hall County on Lake Lanier (the "Lake Lanier Property").    Milani had personally guaranteed that indebtedness and the entire Lake Lanier Property was encumbered by security deeds.

Portofino had also borrowed $1 million from Milani's partner and the bank's loan officer who had made the loans for the 187 acres, William Abraham.    This $1 million loan was secured by approximately 34 of the 221 acres owned by Portofino and MHB Homes.    Abraham later assigned

his loan documents to a limited liability company he formed called Guaranty Capital Group, LLC ("Guaranty Capital").

Included in the 222 acres were two already developed lots on Lake Lanier which were build ready. Through an earlier mediation at which they were represented by FXM, Milani proposed to resolve the collection litigation by conveying to the lender all of the property except the two lake lots. The lender refused to accept this offer, and the litigation continued.

**B.    FXM Asserts Lender Liability Claims & Negotiates Favorable Settlement**

In its forensic examination of the loan documents and the history of the lending relationship, FXM discovered evidence on which it based and brought lender liability claims against the lender. These claims were litigated extensively in the U.S. District Court. On the strength of the lender liability claims and as evidenced by a settlement agreement dated September 30, 2013 (the "Settlement Agreement"), FXM negotiated an extremely favorable settlement with the lender parties, RBC Real Estate Finance, Inc. ("RBC") and PNC Bank, N.A. as successor to the original lending bank ("PNC Bank"). By virtue of the Settlement Agreement the Milani, MHB Homes and Portofino reduced the indebtedness to a very small fraction of the $15 million owed and upon payment of that fractional amount, would get clear title to the Lake Lanier Property that had been security for the loans. The fractional payment was due to be made on December 31, 2013 and, if it was not paid by then, RBC had the right to conduct a foreclosure.

**C.    Milani Refuses to Pay, so FXM Files Lien Against Lake Lanier Property**

FXM earned a fee of $4,790,893.46 (the "Earned Fee"), but Milani refused to pay it, proposing instead to pay FXM a mere $250,000. On October 10, 2013, FXM filed in the Hall County deed records its lien in the amount of the Earned Fee against the entire Lake Lanier Property and related Dock Permits (the "FXM Lien").

**D.      Milani and Others Conspire to Defeat the FXM Lien**

Claiming that the Milani Parties had not timely paid the fractional payment due on December 31, 2013, RBC commenced and, on February 4, 2014, conducted a foreclosure sale of the approximately 166 acres in which it held a security interest - at which sale it only bid approximately $1.2 million. On April 1, 2014, Abraham/Guaranty Capital purportedly conducted a foreclosure sale of the 34 acres in which it held a security interest.

On July 28, 2014, RBC sold the approximately 187 acres to Abraham's limited liability company ("Guaranty Capital") for $1.3 million. On July 31, 2014, Guaranty Capital sold all 221 acres (the 187 acres that had been foreclosed upon by RBC plus the 34 acres that had been foreclosed on by Abraham) to a newly formed entity, Diamond Island, LLC ("Diamond Island"). FXM contends that Diamond Island is Milani's alter ego and that Milani owns or controls that entity. Alternatively, FXM claims that Diamond Island is a mere sham entity formed for the purpose of defeating the FXM Lien.

1. Events between September 30, 2013 and December 31, 2013. In early October 2013, Milani stated that he would not pay any more than $250,000 to FXM against the Earned Fee of $4.8 million. On October 10, 2013, FXM filed its FXM Lien for the full Earned Fee. Pursuant to that certain Land Purchase and Sale Agreement with an offer date of December 12, 2013 (the "December 2013 Portofino-Lu Contract") [**Exhibit 1**: AGC-169 thru AGC-0176], Portofino agreed to sell the Lake Lanier Property to **Diamond Cementer** for $2,670,000 with a closing to occur on or before December 31, 2013. The contract was signed by Milani for Portofino and by X-Lu for Diamond Cementer. Diamond Cementer delivered a check for $300,000 drawn on its account and signed by

Lu. [**Exhibit 2**: AGC-0177] Thus, as of <u>December 12, 2013</u> Portofino had planned to pay the option

price to RBC and "sell" the Lake Lanier Property to Diamond Cementer.

On <u>December 20, 2013</u>, Milani and X-Lu signed that certain Amendment to Agreement #1

(the "First Amendment to Portofino-Lu Contract") extending the closing date of that sale to <u>February</u>

<u>15, 2014</u> [**Exhibit 3**: AGC-0861]. The reasonable inference from these facts are that Milani and X-

Lu would not have changed the date of the closing to <u>February 15, 2014</u> (i.e. a date after the RBC

"foreclosure" was to occur on <u>February 4, 2014</u>) unless, as of <u>December 20, 2013</u>, they already had

an agreement whereby RBC would conduct a sham foreclosure for the intended purpose of wiping

out FXM's Lien

On <u>December 21, 2013</u> (i.e. the very next day after the execution of the First Amendment to

Portofino-Lu Contract), Milani's then attorney, Stan Kreimer, sent what was clearly a contrived email

to RBC/PNC Bank attorney, Curtis Romig, stating (emphasis added):

> Curtis, I represent Fred Milani in regard to the above-referenced matter. He has asked
> me to advise you that **he will not be able to consummate a proposed sale of the
> property, due to complications with certain 3rd parties, and therefore you should
> proceed accordingly**. If you have any questions, please send me an email as I will be
> out of the office for the holiday week. Thank you.  Stan Kreimer.

[**Exhibit 4**: RBC 002649]

Based on the foregoing facts, documents produced and reviewed by FXM, and with the

benefit of all reasonable inferences and presumptions permitted under Georgia law, <u>prior to the</u>

<u>December 31, 2013 deadline</u> for payment of the agreed upon amount to RBC, Milani and RBC (with

the authority and approval given by PNC Bank) agreed to either:

    a.    Accept the payment amount from the Milani Parties or their proxies prior to
        December 31, 2013, but still go ahead with the foreclosure in February 2014;

b.   Wait a couple months, conduct the phony foreclosure, and get an extra $100,000; or

c.   Some other sub rosa agreement by which they would combine to cheat FXM out of its earned fee and attempt to defeat its lien.

Abraham was the loan officer working at Flag Bank in 2005-2007 when the loans were made to Milani, Portofino and MHB Homes. Abraham also personally loaned Portofino $1 million to allow it to acquire a 34 acre portion of the Lake Lanier Property. As part of the negotiation of the settlement with RBC/PNC Bank, FXM had also contemporaneously negotiated an agreement with Abraham whereby he would accept $500,000 as payment in full of his $1 million mortgage owed by Portofino and secured by the 34 acre portion of the Lake Lanier Property.

FXM contends that Abraham and Milani were actually business partners in the Lake Lanier Project, so it was logical after FXM refused to accept Milani's $250,000 fee offer, that Milani and X-Lu would turn to Abraham to play the role of strawman in 2014. Indeed, it would turn out that, by playing strawman, instead of getting the $500,000 that he had agreed to accept, Abraham got $1 million - not a bad pay day for someone who just had to pretend for a couple of months.

2. Events between January 1, 2014 and July 31, 2014. As planned, on February 4, 2014, RBC conducted a foreclosure sale of the 187 Acres and, being the only bidder, knocked off that property for only $1.2 million. On April 1, 2014, Abraham conducted a foreclosure sale of the 34 acres and, like RBC, Abraham's company was the highest bidder at the foreclosure sale and took title to the 34 acres.

On June 6, 2014, Abraham entered into a Purchase and Sale Agreement with RBC by which it would purchase the 187 acres for $1.3 million with a closing on or before July 31, 2014 (the "RBC-Guaranty Capital PSA"). [**Exhibit 5**: AGC-0282 thru AGC-0307]  Significantly, that agreement contained a confidentiality clause whereby the "the parties [agreed] to keep confidential

all information regarding the terms and provisions of this Agreement and all documents delivered

or reviewed by Purchaser in connection therewith . . . ." [AGC-290] It also included the following

provision:

> This Agreement and Purchaser's rights, duties, and obligations hereunder may not be
> assigned by Purchaser without the prior written consent of Seller, except to (i) an
> affiliate of Purchaser, or (ii) **the Ultimate Buyer (as defined in Section 24 below)**,
> as to either of which Seller's consent shall not be required but Purchaser shall provide
> notice thereof to Seller. [AGC-0288]

The following Section 24 captioned as "Simultaneous Sale Contingency" was also included (with

bold emphasis added):

> Purchaser currently owns approximately 47 acres of property adjacent to the Property
> (the "Adjacent Property"). **It is the intent of Purchaser to sell both the Property
> and the Adjacent Property to a 3rd party purchaser (the "Ultimate Buyer")
> simultaneously with the Closing hereunder, either by an assignment of this
> Agreement to the Ultimate Buyer with title passing directly from Seller to the
> Ultimate Buyer or by the purchase of the Property by Purchaser and the
> simultaneous sale of Property to the Ultimate Buyer**. Purchaser intends to enter
> into a purchase contract with the Ultimate Buyer during the Inspection Period. In the
> event Purchaser is unable to sell the Property and the Adjacent Property to the Ultimate
> Buyer simultaneously with the Closing, Purchaser may elect to (i) waive such
> contingency and proceed to Closing; or (ii) terminate this Agreement by giving written
> notice of such termination to Seller, in which case all Earnest Money shall be returned
> to Buyer within two (2) business days of Buyer's written notice of termination and this
> Agreement shall become null and void, except for those provisions herein which are
> specified to survive termination of this Agreement.

[AGC-0294] A reasonable inference from these terms alone, is that RBC, PNC Bank, Abraham, X-

Lu, and the Milani Parties all knew full well that Abraham and his company were acting as mere

straw men for Milani.

Even before the RBC-Guaranty Capital PSA was signed, Abraham had prepared a Land

Purchase and Sale Agreement dated <u>June 10, 2014</u> with **X-Lu** as the purchaser of the entire Lake

Lanier Project property  for a price of $2,300,000 (the "Lu-Guaranty Capital PSA") [**Exhibit 6:**

AGC-0145 thru AGC-0152 ].   The address given for X-Lu was 1988 Shaudi Lane, Atlanta, Georgia 30345.  Within 10 days of executing the RBC-Guaranty Capital PSA, Abraham signed an agreement dated <u>June 16, 2014</u> to sell the entire Lake Lanier Property - not to X-Lu - but to **Diamond Cementer** with the closing to take place on or before <u>July 31, 2014</u>. [**Exhibit 7**: AGC-0013 thru AGC-0030].

Proving that he was just a straw man, prior to the closing of the purchase of the 187 acres from RBC, Abraham would send an email to RBC stating: "*We could probably **cut down on some costs and issues if RBC conveyed directly to my buyer instead of to me and then me to my buyer** – or you guys could sign the necessary documents in advance and the attorney could hold in "escrow" if timing and travel is an issue.*" [**Exhibit 8**: RBC002791] In other words, fully aware that he was going to simply convey what he got from RBC together with his 34 acres to X-Lu/Milani, Abraham was trying to avoid having to pay transfer tax on two transactions.  Of course, RBC did not go along with Abraham's suggestion because it knew that collapsing the transactions would look too suspicious.  Instead, the parties had contemporaneous closings on July 31, 2014 and paid double transfer taxes to avoid the appearance that Abraham was merely a strawman for X-Lu and Milani.

Pulling a page right out of the book they had written with the White House, the Church Property and the Bayshore Home, instead of using Diamond Cementer to take title to the Lake Lanier Property, on <u>July 29, 2014</u>, X-Lu and Milani formed a new entity, Diamond Island, LLC. **(Exhibit 9)**   An attorney named Thad C. Gould was both the organizer and registered agent for Diamond Island and its principal place of business was stated as being at 1988 Shaudi Lane, Atlanta, Georgia 30345 (i.e. X-Lu's home that Milani built for him).  **Yueling Lu** ("Y-Lu") is shown as having been

the member/manager who signed the 2015 annual registration filed with the Georgia Secretary of State. [Id.]

According to that certain Limited Warranty Deed dated July 28, 2014 and recorded in the office of the Clerk of the Superior Court of Hall County, Georgia on August 6, 2018 in **Deed Book 7400, Pages 682-687 (Exhibit 10)**, in exchange for $1,300,000, RBC conveyed to Guaranty Capital the 137.9075 Acre Tract, the 17.002 Acre Tract, Lot 23 (1.07 Acres), and Lot 24 (1.7 Acres less and except a described portion thereof).

According to that certain Limited Warranty Deed dated July 31, 2014 and recorded in the office of the Clerk of the Superior Court of Hall County, Georgia on August 6, 2018 in **Deed Book 7400, Pages 688-693 (Exhibit 11)**, in exchange for $2,300,000, Guaranty Capital conveyed to Diamond Island, LLC the 137.9075 Acre Tract, the 17.002 Acre Tract, Lot 23 (1.07 Acres), Lot 24 (1.7 Acres less and except a described portion thereof ), and the 33.801 Acres.

While the two foregoing deeds are dated on two different days, they both were recorded one behind the other in the deed books - thereby creating the presumption that they were, indeed, simultaneously executed and delivered.

### III.  2014 DeKalb Lawsuit is Filed & Milani Files 3rd Bankruptcy

On December 16, 2014, FXM filed a lawsuit against Milani, MHB Homes and Portofino in DeKalb Superior Court (the "2014 DeKalb Lawsuit").  On February 22, 2015, those parties were all served with the summons, complaint and written discovery.  On March 12, 2015, Milani filed this, his third personal bankruptcy petition in 5 years (the "2015 Bankruptcy Case"), listing in his schedules a non-contingent, liquidated, and undisputed debt owing to FXM in the amount of $4,790,864.00.  On July 8, 2015, Milani obtained a discharge (the "Discharge Order")[Dkt#33].

Neither Portofino nor MHB Homes ever filed an answer in the 2014 DeKalb Lawsuit and, after a trial on damages, a judgment was entered against both of them on September 21, 2015 in the amount of $4,790,893.46 . A fifa has since been issued on this judgment which has been filed in the Hall County deed records. The original fifa which, by virtue of an error by the Clerk, included Milani together with the since corrected fifa excluding Milani and related correspondence with the clerk's office are attached as composite **Exhibit 12**[1]. That is where things stood until late in 2017.

## IV.  2017 DeKalb Lawsuit is Filed & Milani Re-Opens Bankruptcy

### A.    The Complaint is Filed.

On September 28, 2017, FXM filed a complaint (the "Complaint") in DeKalb Superior Court against the Debtor and others thereby commencing the case that is styled as *FXM, P.C. d/b/a Frank X. Moore Law v. Fred Milani, MHB Homes, LLC, Hadi Homes, Inc., PNC Bank, N.A., RBC Real Estate Finance, Inc., Guaranty Capital Group, LLC, William C. Abraham, Diamond Island, LLC, Xiangtong Lu, Yueling Lu, Ruiping Xiao, and John Doe-1 through John Doe-10*, Superior Court of DeKalb County, Georgia, Case No. 17CV10275-7 (Judge Coursey) (the "2017 DeKalb Lawsuit").

The Complaint [Dkt#55-1, pp1-80] included the following eight (8) counts: **Count 1**: Set Aside Foreclosure Sale & Equitable Lien; **Count 2**: Wrongful and Collusive Foreclosure; **Count 3**: Fraud; **Count 4**: Civil Theft by Deception; **Count 5**: Fraudulent Transfers; **Count 6**: Judicial Foreclosure of Attorney Lien; **Count 7**: Constructive Trust; and **Count 8**: Protective Order.  In paragraphs 196-199 of the Complaint, FXM acknowledged that Milani had filed personal bankruptcy

---

[1] The fact of the clerk's error was reported at the status conference in this case on February 21, 2018 and, at that time, the Court and Milani's counsel were given copies of the corrected fifa which excluded Milani's name.  Composite Exhibit 12 includes the email correspondence in which the Clerk admits her error and the corrected fifa and first page of the judgment that were produced and delivered to Milani's counsel on February 21, 2018.

and obtained a discharge in 2015 [Dkt#55-1, p47].  In each count in the Complaint, FXM incorporated the following allegation:

> [FXM] has named Milani as a defendant solely for the purpose of recovering damages and obtaining relief for Milani's conduct, transactions or occurrences after March 12, 2015 or for **any conspiracy that he joined in, continued, or ratified on and after March 12, 2015 to the fullest extent permitted under applicable bankruptcy and Georgia law**.

[Dkt#55-1, p47, ¶200].  In the counts seeking damages against Milani, FXM included the following (or something similar - with bold emphasis added):

> Because Milani took actions after March 12, 2015 to participate, ratify, and gain the benefit of the conspiracy that resulted in the wrongful and fraudulent foreclosures, the **FXM Law Firm seeks a judgment against him personally to the fullest extent permitted under applicable bankruptcy law**.

[Dkt#55-1, p52, ¶222; p53, ¶233; p56, ¶247; p58, ¶255].

In its "First Amended & Restated Complaint" filed in the 2017 DeKalb Lawsuit on January 4, 2018 [Dkt#55-2, pp1-84] ("Restated Complaint"), FXM essentially repeated the allegations in the original Complaint, but relative to Milani's bankruptcy, added the following paragraph:

> Based on the law applicable to Chapter 7 discharges, the FXM Law Firm believes in good faith that the discharge was effective to bar any action to collect from Mr. Milani, personally, but did not discharge or avoid the Attorney Lien, did not discharge any debt owing to the FXM Law Firm by MHB Homes or Portofino, and did not bar any rights the FXM Law Firm has to seek an *in rem* recovery of any debt by asserting any lien rights it had or perfected prior to Mr. Milani's bankruptcy.  Regardless of whether this is a correct statement of the law, **it is the FXM Law Firm's intent in filing this lawsuit to not violate Mr. Milani's personal bankruptcy discharge**.

[Dkt#55-2, p51, ¶199-A].

## B.    Xiangtong Lu - Milani's Fixer: The White House

The Complaint and Restated Complaint included detailed allegations regarding Milani's pre-bankruptcy combination with Mr. Xiangtong Lu ("X-Lu") using Diamond Cementer, LLC

("Diamond Cementer") that presaged a similar combination to defeat the FXM Lien [Dkt#55-2, pp25-33, ¶¶100-137].

Milani has been a high-end home builder for many years. One of Milani's customers was X-Lu, a wealthy Chinese national who had moved to Atlanta. Since 2008-2009 when Milani's credit was destroyed and could no longer get conventional loans, X-Lu came to be Milani's go-to source of cash. Both the Complaint and the Restated Complaint included specific allegations showing how X-Lu and Milani stripped away and defeated junior liens on Milani's White House home (a replica of the White House in Washington D.C.) that he had at one time listed for sale at a price of $10 million.

FXM represented Milani when he was facing foreclosure proceedings against the White House brought by an entity claiming to be the first mortgage lender of a $1.7 million loan. There were two other junior mortgage loans on the White House totaling approximately $3.2 million. While engaged in litigation with the parties who had commenced foreclosure proceedings, a stranger to the litigation commenced foreclosure against the White House pursuant to the power of sale in the first priority lien. Believing that this stranger-commenced foreclosure was the proof positive that the defendants in the foreclosure litigation had no right to foreclose, FXM advised Milani that his case had just become very strong. Milani, however, instructed FXM to refrain from further litigation, as he was going to simply let the stranger-foreclosure proceed. Milani would later tell Moore that X-Lu gave him the money to buy the White House on the courthouse steps. [Dkt#55-2, p30, ¶118] Here is how that worked.

The pretender-lender-interloper foreclosure was set to occur on the first Tuesday in July 2011. Just prior to that date, on June 30, 2011, **Diamond Cementer, LLC** was formed with a principal office shown at 1988 Shaudi Lane, in the Oak Grove Preserve subdivision in Atlanta, DeKalb

County, Georgia (the "Shaudi Lane Home") [**Exhibit 13** and Dkt#55-2, p30, ¶120].  Milani had

developed the Oak Grove Preserve subdivision and built a home with that address for X-Lu.  [Id.]

According to the tax records, that home remains titled in the name of X-Lu and Defendant Ruiping

Xiao. [**Exhibit 14** and Id.]

According to deed records, on July 5, 2011, Diamond Cementer "loaned" strawman,

**Jacqueline Reese** ("Reese"), $1,190,000 secured by the White House. (**Exhibit 15**)  That same day,

as Milani reported to FXM, Reese purchased the $10 million White House by bidding $1,125,213.87

(sic) on the courthouse steps. [**Exhibit 16** and Dkt#55-2, p29, ¶113] While unaware at the time of

the true dealings, FXM was asked by Milani to prepare a "lease" by which Reese was "kind enough"

to allow Milani to remain in occupancy of the White House after the foreclosure. [Dkt#55-1, pp 66-

72 (lease & bill of sale) and Dkt#55-2, p29, ¶¶116-117]

While the details are not in the Restated Complaint, the public records include a Quit Claim

Deed recorded on August 23, 2013 from Reese to **Iraj Jake Nadjmazhar** ("Jake") who, FXM

understands to be a relative or friend of Milani. Based on the transfer tax paid, it appeared that Jake

paid a mere $1.5 million for the White House.  (**Exhibit 17**) A few months later, by deed recorded

on November 18, 2013, Jake conveyed the White House and the adjacent property to **Daniel Nhu**

**Nguyen** ("Nguyen") for what appears, based on the transfer tax stamp, to have been a total price of

$2.2 million. (**Exhibit 18**)  One month later, Nguyen conveyed the White House to **Atlanta White**

**House, LLC** ("Atlanta White House"), an entity formed on November 5, 2013 with Nguyen shown

as the organizer and registered agent.  (**Exhibit 19**) Upon information and belief, Reese, Jake,

Nguyen, and Atlanta White House are all straw owners holding the White House for the benefit of

Milani.

Thus, FXM contends in the Restated Complaint that with the assistance of X-Lu and other conspirators, Milani has been able to retain control of the $10 million White House by purchasing it at a foreclosure sale for $1.1 million - a foreclosure sale that purportedly wiped out over $3.8 million of liens. The rewarding experience with the White House would motivate Milani to use this technique again and again.

## C.    Xiangtong Lu - Milani's Fixer: The Church Property

Adjacent to the White House on Briarcliff Road in Atlanta, DeKalb County, Georgia and sharing the same gated driveway is a 1 acre property on which Milani built a church, using money borrowed from RBC Bank - now known as PNC Bank. According to deed records, on <u>July 23, 2013</u>, a Deed Under Power was recorded which shows that for $620,222.67 (sic) **Iraj Jake Nadjmazhar** acquired the Church Property at a foreclosure sale conducted on the first Tuesday of July 2013. (**Exhibit 20**) FXM contends that, like Reese, Jake got the money to purchase the Church Property from X-Lu.

By the same deed by which Jake conveyed the White House to Nguyen, which deed was recorded on November 18, 2013, Jake also conveyed the Church Property to Nguyen for the total price of $2.2 million. By deed recorded on December 16, 2013, Nguyen conveyed the Church Property to Atlanta White House. (**Exhibit 21**)

Thus, FXM contends that with the financial assistance of X-Lu and the aid of other strawman conspirators including, but not limited to, PNC Bank, Jake, and Nguyen, Milani has been able to retain control of the Church Property by having his friend/relative Jake purchase it at a foreclosure sale for $620,000.

**D.**   **Xiangtong Lu - Milani's Fixer: 662 Bayshore Drive**

Milani owned a bay front home with dock worth over $1.2 million having an address of 662 Bayshore Drive, Miramar Beach, Walton County, Georgia (the "Bayshore Home") that was subject to a $1 million loan that came to be held by PNC Bank. According to deed records, on <u>June 12, 2013,</u> PNC Bank sold the Bayshore Home at foreclosure sale to **Iraj Jake Nadjmazhar** who gave his address as 1965 Carlotta Court, Atlanta, Georgia 30345. By deed dated <u>December 16, 2015,</u> Jake conveyed the Bayshore Home to Milani and his wife. After Milani's wife passed away, Milani became and remains the sole owner of the Bayshore Home[2].

Thus, FXM contends that with the financial assistance of X-Lu and the aid of strawman conspirator and friend/relative Jake and PNC Bank, Milani has been able to retain control of the $1.3 million Bayshore Home.

**E.**   **Xiangtong Lu - Milani's Fixer: Lake Lanier Property**

Even though they received detailed written discovery requests at the same time they were served by the Sheriff with the summons and Complaint in the 2017 DeKalb Lawsuit, the Milani Parties, X-Lu and Diamond Island have provided virtually no responsive information or any documents whatsoever. On the other hand, Guaranty Capital and William C. Abraham (both being defendants in the 2017 DeKalb Lawsuit who were also served with written discovery with the summons and Complaint) produced a number of documents that were in their possession some of which are described below.

---

[2] This transaction is discussed in more detail with exhibits attached later in this brief.

**F.    Allegations in Complaint Include Milani Conduct After March 12, 2015**

Milani accuse Respondents of contempt because, they say, in the 2017 DeKalb Lawsuit, FXM

seeks to recover damages from Milani for a conspiracy in which Milani only participated prior to

March 12, 2015. This "fact" is so apparent from the face of the Complaint, argues Milani, that the

naming of and service on Milani of the Summons, Complaint, and written discovery was a patent

violation of his discharge injunction that rendered such naming and service void *ab initio*.  Milani

and his attorneys are parsimonious in their description of the Complaint.  Consider the following

allegations from the initial Complaint [Dkt#55-1] which reference and describe in what is necessarily

and admittedly general terms, Milani's post-bankruptcy participation in the conspiracies to harm

FXM.

## I.  INTRODUCTION

6. The filing of the lien enraged Milani, and he first threatened and intimidated his
attorney.  When that did not work, Milani devised a scheme with the bank and others
to **let the bank foreclose, thereby wiping out the lien, with the plan being that
Milani would come back later and purchase the 222 acres** for a mere extra
$100,000.

7. The persons and entities that colluded and conspired with Milani to cheat the FXM
Law Firm included **(a)** the bank (PNC Bank) and its subsidiary (RBC REFI); **(b)** the
bank's former lending officer and Milani's business partner (Abraham); and **(c) the
people who gave Milani the cash and agreed to hold title to the 222 acres until
after Milani bankrupted and were discharged from being liable for the FXM Law
Firm debt (X-Lu, Y-Lu and Ruiping).**

8. **One of the best ways to prove a conspiracy is to show that the defendants have
done the same or similar fraudulent dirty dealings before.   This complaint does
that.**

## III.  THE PARTIES & THEIR ROLES

22.   Defendants are personally, individually, jointly and severally liable for the acts
and omissions described in this Verified Complaint by and through either: (a) their
own participation in creating a conspiracy whereby they devised, planned and
committed torts against the FXM Law Firm; **(b) joining in the conspiracy described**

herein and accepting or adopting the benefits of the conspiracy; or **(c) ratifying the conspiracy.**

46. **Milani made use of multiple specially formed limited liability companies or corporations to  conduct his business,** however, because these companies were sometimes single asset entities created for a particular subdivision or project, the banks required that Milani guarantee the debt.

47. **Milani is the principal and managing member and owner of MHB Homes, Portofino,  Hadi Homes and, upon information and belief, <u>Diamond Island</u>.**

48. MHB Homes, Portofino, Hadi Homes and **Diamond Island, among others, are all alter egos of Fred Milani.**

118. Much later, Milani confided in Moore that, in fact, his money man, "Mr. Lu," had given Reese the money to purchase the White House at the foreclosure sale.

119.    Research done in the course of preparing for the filing of this complaint confirms Milani's admission and presents a road map for how Milani would cheat the FXM Law Firm, just as he had cheated his three creditors holding junior security interests in the White House.

120. Diamond Cementer, LLC was created on June 30, 2011 with a principal office address of 1988 Shaudi Lane, Atlanta, DeKalb County, Georgia 30345 (the "Shaudi Lane Home") which is part of Oak Grove Preserve which was developed by Milani. According to tax records the home at that address is owned by Xiangton Lu and Xiao Ruiping.

121.  Five days later on July 5, 2011, the White House was foreclosed with Reese as the purported purchaser.

122.  Also on July 5, 2011, Diamond Cementer, LLC loaned Jacqueline Reese $1,190,000 with a maturity date of July 4, 2014.  The collateral for the loan was Lots 5 and 6 of H.G. Shepard Property, i.e. the White House and the adjacent lot on which Milani had built his church.  That same loan was apparently cancelled as of May 24, 2013.

131.  **"Mr. Lu" is the unconventional cash source for Milani and his alter ego limited liability companies, corporations, and straw men.**

132.  "Mr. Lu" and Xiao Ruiping are the owners of the Shaudi Lane Home.

133. According to the Georgia Secretary of State's website, Yueling Lu is a member of Diamond Island, LLC.

134. **Diamond Island, LLC was formed for the specific purpose of perpetrating a fraud on the FXM Law Firm and cheating it out of the fee that it earned in its highly successful representation of Milani and his alter ego entities**.

135. Xiangtong Lu, Yueling Lu and Xiao Ruiping (collectively referred to as the "Lu Defendants") all participated in a conspiracy with the other defendants for the express purpose of cheating and defrauding the FXM Law Firm.

138. Each of the Defendants, by joining and participating in a civil conspiracy or by ratifying, approving or accepting the benefits of the acts of the others in furtherance of the improper and tortious conspiracy directed against the FXM Law Firm, is liable for the acts of those others, jointly and severally.

139. Throughout this Complaint, the FXM Law Firm describes the acts or omissions of named Defendants. Each act or omission described herein as being taken by any one of the Defendants, however, has been an action or omission taken as part of a conspiracy in which: **(a)** all of the Defendants have participated; **(b)** all Defendants have sought to take from or deprive the FXM Law of money, profits, property, property rights, or benefits owing or belonging to the FXM Law Firm; or **(c)** which all Defendants have ratified. Consequently, **the actions described as being taken by any one of the Defendants in furtherance of their joint conspiracy are also imputed to and deemed to be the act of each and all of the other Defendants**.

178. Upon realizing that the FXM Law Firm was not going to accept $250,000 as payment for the fee it had earned and that none of the events he had orchestrated had worked to get Moore to back down, Milani concluded that it would be cheaper to simply collude with all of the Defendants to wipe out the Attorney Lien and cheat the FXM Law Firm out of its earned fee.

180. Prior to the December 31, 2013 deadline for payment of the $1,200,000 to RBC REFI, Milani and RBC REFI (with the authority and approval given by PNC Bank) agreed, in exchange for payment of an extra $100,000, to wait until after December 31, 2013 and conduct a "friendly," or collusive, foreclosure against the properties. **It was also agreed and understood that "Mr. Lu" would provide the $1.3 million for Milani and his alter egos to buy the foreclosed properties back from RBC REFI after they foreclosed**.

181. In accordance with their deceptive and fraudulent plan, RBC REFI advertised in January 2014 for foreclosures in February 2014 under all of the security deeds it held against the 137.9075 Acres, the 17.002 Acres, Lot 23 (1.07 acres), Lot 24 (1.7 acres), and the 28.749 Acres (the foregoing being collectively referred to herein as the "Bank Properties").

183. As part of the fraudulent and collusive plan, RBC REFI agreed that it would not bid more than $1.2 million for all of the Bank Properties because, if it did, it would create excess funds that would inure to the benefit of the FXM Law Firm because of its lien.

## IX.   WITH ABRAHAM AS STRAWMAN, MILANI AND/OR "MR. LU" RE-ACQUIRE ALL OF THE PROPERTY FOR THE LAKE LANIER PROJECT

189. Believing they had wiped out the Attorney Lien, the Defendants brazenly and openly continued with their scheme.

190.   True to the prearranged agreement reached among the Defendants prior to December 31, 2013, by deed dated July 28, 2014, Abraham and Guaranty Capital purchased from RBC REFI for Milani's benefit the 137.9075 Acres, the 17.002 Acres, Lot 23 (1.07 acres) and the 28.749 Acres that RBC REFI had foreclosed on. The consideration reflected on the recorded deed was $1.3 million (i.e. $100,000 more than the $1.2 million that RBC REFI had agreed to accept in the Settlement Agreement, but a lot less then $4.8 million that was owed to the FXM Law Firm).

191. Upon information and belief, **Abraham and Guaranty Capital did not have $1.3 million in cash to pay to RBC REFI. Instead, this money was provided by "Mr. Lu" on behalf of himself and/or Milani.**

192.   Three days after Abraham and Guaranty Capital purchased the properties foreclosed on by RBC REFI, Guaranty Capital sold the 33.801 Acres of Portofino's property that Guaranty Capital had foreclosed on in April 2014 and all the property it had acquired from RBC REFI to Diamond Island. According to the transfer tax paid as shown on the recorded deed, Diamond Island paid $2.3 million for the 222 acres of property that was to be the Lake Lanier Project.

193. So, after July 31, 2014, this is how things stood: (a) RBC REFI which had agreed to accept $1.2 million had received $1.3 million; (b) Abraham/Guaranty Capital which had agreed to accept $750,000 had received $1 million; (c) Milani and Mr. Lu had re-acquired all 222 acres of the Lake Lanier Project property for a song because of the FXM Law Firm's hard work; and (d) the FXM Law Firm was screwed - at least seemingly.

## X.   THE FXM LAW FIRM SUES & MILANI FILES HIS THIRD BANKRUPTCY CASE

194. On December 16, 2014, the FXM Law Firm filed a lawsuit for breach of contract against Milani, Portofino and MHB Homes. At the time, Moore was unaware of the scheme that had been devised and implemented by the Defendants.

199.  On September 24, 2015, Milani received a discharge from his debts, including the debt he owed the FXM Law Firm, and his Chapter 7 case was closed and dismissed.

200.  **The FXM Law Firm has named Milani as a defendant solely for the purpose of recovering damages and obtaining relief for Milani's conduct, transactions or occurrences after March 12, 2015 or for any conspiracy that he joined in, continued, or ratified on and after March 12, 2015 to the fullest extent permitted under applicable bankruptcy and Georgia law.**

## XI. THE ASSETS OF PORTOFINO AND MHB HOMES ARE DISTRIBUTED

201.  Portofino and MHB Homes had paid for and procured valuable property including, but not limited to, engineering studies and reports, surveys, plats, drawings, dock permits, covenants, homeowner association documents, marketing materials and leads, and other valuable assets that were intended to be used in the Lake Lanier Project (the "Personal Property").

204.  The Personal Property has remained the property of Portofino and MHB Homes.

205.  **Presumably after he filed his third bankruptcy case, Milani caused Portofino and MHB Home to distribute the Personal Property to him for use in his new incarnation of the Lake Lanier Project.**

206.  Milani has allowed both Portofino and MHB Homes to be administratively dissolved by the Georgia Secretary of State.

207.  Under O.C.G.A. § 14-11-605, to the extent a dissolved limited liability company does not discharge, make provision to discharge, or properly dispose of a claim against it, such claim may be enforced against the limited liability company, to the extent of its undistributed assets; or against each member receiving a distribution in winding up, to the extent of the assets so distributed to such member.

208.  **Milani, in conspiracy with Xiangtong Lu, Yueling Lu and Xiao Ruiping and using a Milani alter ego, Diamond Island, LLC, have exercised dominion and control over the Personal Property, thereby defrauding the FXM Law Firm as creditor of Portofino and MHB Homes.**

### COUNT 1 – SET ASIDE FORECLOSURE SALE & EQUITABLE LIEN

219.  In the alternative, the FXM Law Firm requests that the Court issue a judgment and decree declaring that **Diamond Island's interest in and to the property that was originally intended for the Lake Lanier Project, be subject to the first-in-priority liens created or perfected by the Attorney Lien and the Default Judgment.**

## COUNT 2 – WRONGFUL AND COLLUSIVE FORECLOSURE

222. Because Milani took actions after March 12, 2015 to participate, ratify, and gain the benefit of the conspiracy that resulted in the wrongful and fraudulent foreclosures, the FXM Law Firm seeks a judgment against him personally to the fullest extent permitted under applicable bankruptcy law.

## COUNT 5 – FRAUDULENT TRANSFERS

256. At the time that the Milani caused Portofino and MHB Homes to transfer their Personal Property to Diamond Island, Milani, Portofino, MHB Homes, the Lu Defendants and Diamond Island knew about the Attorney Lien and the Default Judgment.

257. Both prior to and after Portofino and MHB Homes conveyed the Personal Property to Diamond Island, the FXM Law Firm was a creditor of Portofino and MHB Homes.

**258. By conveying the Personal Property to Diamond Island, the Milani Parties manifested an actual intent to convey the Personal Property so as to hinder, delay or defraud the FXM Law Firm.**

259. By conveying the Personal Property to Diamond Island, Milani, Portofino, MHB Homes, Diamond Island and the Lu Defendants caused a conveyance of the Personal Property with the intent to defraud the FXM Law Firm and shelter the Personal Property from the Attorney Lien and the Default Judgment.

260. Milani, the Lu Defendants, Diamond Island, and Hadi Homes had actual knowledge of the intent of Portofino and MHB Homes, as grantors of the Personal Property, to convey said Personal Property in order to hinder, delay, or defraud the FXM Law Firm, or knew of circumstances that should have put them on notice of such fraudulent intent.

261. The FXM Law Firm has been damaged by the fraudulent conveyance from Portofino and MHB Homes to Diamond Island.

## COUNT 6 – JUDICIAL FORECLOSURE OF ATTORNEY LIEN

**268. Portofino, MHB Homes, Hadi Homes, and Diamond Island are all alter egos of Milani. Thus, property titled in the name of Diamond Island is property belonging to Milani and his set of alter ego companies especially including Portofino, MHB Homes and Hadi Homes. Consequently, property that is now titled in the name of Diamond Island should be determined, in equity or at law, to be after acquired property to which the Attorney Lien and Default Judgment attach.**

269. The FXM Law Firm is entitled to a judgment and decree in equity: **(a) declaring that it is the holder of a first-in-priority equitable lien or mortgage with the right**

to conduct a judicial sale of all 221.2295 Acres of property that was originally
intended to be part of the Lake Lanier Project and the Personal Property; or (b)
authorizing it to conduct a judicial sale of the 221.2295 Acres and the Personal
Property under terms as are allowed by the Court in order to satisfy the Attorney Lien
and the Default Judgment and any damages awarded for the claims asserted herein.

## COUNT 7 – CONSTRUCTIVE TRUST

273.  Based on their past conduct, the Count 7 Defendants will continue to make
fraudulent conveyances in order to defeat the Attorney Lien, the Default Judgment, and
the damages that the FXM Law Firm is entitled to collect hereunder.

274.  **Upon information and belief, Diamond Island and Hadi Homes and MHB
Homes may be undercapitalized.**

275.  **Upon information and belief, Diamond Island, Hadi Homes and MHB
Homes have failed to abide by the formalities required of an artificial entity (e.g.
separate books, separate tax returns, separate bank accounts, etc.).**

276.  Upon information and belief, if Diamond Island, Hadi Homes or MHB Homes
is allowed to sell the property described in the Attorney Lien free and clear of the
Attorney Lien and the Default Judgment, it will secret those assets out of the State of
Georgia and out of the United States and its territories.

277.  **For all of the foregoing reasons, and such additional reasons as may be
established through discovery, this Court should impose a constructive trust on
the interests of Diamond Island,** Hadi Homes, Portofino and MHB Homes in and to
the property that is identified in the Attorney Lien and the Personal Property.

On January 4, 2018, FXM filed its Amended & Restated Complaint in which it included the

following relevant allegations:

199-A.  Based on the law applicable to Chapter 7 discharges, the FXM Law Firm
believes in good faith that the discharge was effective to bar any action to collect from
Mr. Milani, personally, but did not discharge or avoid the Attorney Lien, did not
discharge any debt owing to the FXM Law Firm by MHB Homes or Portofino, and did
not bar any rights the FXM Law Firm has to seek an in rem recovery of any debt by
asserting any lien rights it had or perfected prior to Mr. Milani's bankruptcy.
Regardless of whether this is a correct statement of the law, it is the FXM Law Firm's
intent in filing this lawsuit to not violate Mr. Milani's personal bankruptcy discharge.

209-A.  **Once a mental state has been proven to exist, it can be presumed.** See
O.C.G.A. §24-14-21. **The foregoing allegations demonstrate that Mr. Milani, with
the assistance of Mr. Lu and others, worked to defeat junior creditors holding**

**security interests in the White House (and potentially the building next to it) by participating in what was a sham or collusive foreclosure using straw men.**

209-B. On its face, it makes no sense for RBC-REFI, when cloaked in a fiduciary duty and obligated under the law to act in good faith and, indeed, in the utmost good faith for the benefit of its borrowers (and the FXM Law Firm), to conduct foreclosure sales and bid a mere $1.2 million for property that was worth many times that amount.

209-C. On its face, it makes no business or logical sense for RBC-REFI to buy property worth $16 million only to turn around and sell it for $1.3 million.

209-D. On its face, it makes no business or logical sense for RBC-REFI to notice and conduct a foreclosure on Lot 23 and Lot 24, yet prepare and file a Deed Under Power which purports to convey Lot 23 and Lot 24, but then includes an exception for Lot 24 - the net effect being that, after the foreclosure sale was cried out and both lots sold, RBC-REFI in preparing the Deed Under Power waived the right to foreclose on Lot 24 - thereby attempting to provide a benefit to Hadi Homes - another affiliate or alter ego of Mr. Milani.

209-E. **On its face, it makes no business or logical sense for Abraham and Guaranty Capital to buy property worth $16 million for a mere $1.3 million only to turn around and sell it to the Milani owned or controlled Diamond Island for what was essentially the same amount he paid.**

209-F. **The only way all of these transactions make any business or logical sense is because they were all part of the scheme to cheat and defraud the FXM Law Firm.**

The bold portions of these allegations establish several things that clearly describe events, circumstances, transactions and occurrences occurring after March 12, 2015. The easiest and most simple ones allege that Diamond Island is Milani's alter ego. Once proven, this allegation will establish that Milani, through Diamond Island, re-joined the conspiracy after March 12, 2015 by owning, directly, indirectly, legally or beneficially the Lake Lanier Property. The other thing these allegations make clear is that Diamond Island also somehow, sometime came to own the Personal Property including the plans, drawings, tests, engineering, and Dock Permits. These are assets that have much more than mere nominal value to the Lake Lanier Property, the development of which

Diamond Island has been vigorously pursuing - starting after the cooling off period following the foreclosure and Milani's bankruptcy filing.

**G.    Discharge Injunction Violations Require Clear and Convincing Evidence**

Importantly, the 11th Circuit Court of Appeals has held that: "a finding of civil contempt must be based on **clear and convincing evidence** that a court order was violated rather than the **preponderance-of-the-evidence** standard typically employed in civil actions." (bold emphasis added and internal quotes omitted) *Green Point Credit, LLC v. McLean (In re McLean)*, 794 F.3d 1313 (11th Cir., 2015)(citing *Jove Eng'g, Inc. v. Internal Revenue Serv.*, 92 F.3d 1539, 1545 (11th Cir.1996)  Indeed, it strains credulity that Milani's seasoned lawyers would have read the initial Complaint and concluded that it was so bereft of any allegations of events, transactions, occurrences, or circumstances that, in its entirety and as to each and every count therein, clearly and convincingly violated the discharge injunction such that the Complaint, in its entirety, was void *ab initio*.

As for whether the Complaint describes, with the specificity Milani wants, exactly what Milani did after March 12, 2015 for which FXM seeks to hold him liable, that is what discovery is supposed to be about.   After all, participants in fraudulent conspiracies rarely: (a) publish or announce their plan; (b) admit to being a participant in the conspiracy; or (c) describe the actions each of them took in furthering the objectives of the conspiracy.   But before going there, it bears some discussion about what a conspiracy is and what it takes to show that a defendant participated in one.

**H.    Milani Intentionally Defaults & Re-Opens This Case**

Instead of filing answers for any of the Milani Parties, on <u>December 7, 2017</u>, Clapp filed an *ex parte* motion to re-open this case "to pursue possible discharge violations against FXM, P.C.

and/or Frank X. Moore." [Dkt#39]   In that pleading, Milani alleged that "FXM initiated legal

proceedings against Debtor regarding a pre-petition debt(s)."  After the Court entered an order re-

opening this case [Dkt#43], Milani filed that certain "Motion for Entry of an Order Compelling

Frank X. Moore to Appear and Show Cause as to Why He Should Not Be Held in Contempt for

Violation of the Discharge Injunction Imposed by §524(a)(2) of the Bankruptcy Code, for Sanctions,

Including an Award of Damages and Reasonable Attorney's Fees, and for Related Relief" [Dkt#46]

(the "Contempt Motion") in which he made the following allegations (bold and underline emphasis

added):

> 3.  Debtor amended schedule D on June 6, 2015, scheduling noth(sic) Frank X. Moore
> and FXM, PC as a (sic) secured creditors.
>
> 5. This Court entered an Order of Discharge on February 8, 2012 (sic). (Doc.68) (sic)
> the Court's discharge Order was served on the Heritage Bank (sic) on or about
> February 8, 2012 (sic). (See Doc #59) (sic)
>
> 6. On or about September 28, 2017, FXM filed a complaint against Debtor (and other
> Defendants), alleging fraud, conspiracy, collusion, bad faith, civil theft, etc., **based
> upon actions that <u>primarily</u> took place between on (sic) 2008 and 2014**.
>
> 7. FXM's complaint states that Debtor is named as a Defendant based on conduct that
> occurred after March 12, 2015, including continuing conspiracy.  **However, the
> complaint fails to allege any specific actions by Debtor on or after March 12,
> 2015.**  All allegations in FXM's complaint contain elements relating back to actions
> prior to this bankruptcy, and therefore fall under the protection of the permanent
> discharge injunction from 11 U.S.C. §524.
>
> 8.  As a result of FXM's actions, Debtor has suffered and continues to suffer actual
> damages including attorney fees for defending the State Court action and extreme
> emotional distress.
>
> 9. **FXM's actions as set forth herein constitute a willful violation of the discharge
> injunction** granted to Debtor . . . .

Milani's statement that the claims in FXM's complaint are "based upon actions that <u>primarily</u> took

place between on (sic) 2008 and 2014" constitutes an admission that there were other actions that

took place after 2014 - including after March 12, 2015 (the date this case was filed). Milani is also correct, however, that at the time the Complaint was filed, FXM did not have all of the details of how Milani had continued his participation in the conspiracy. Again, that is why FXM served written discovery on Milani with the Complaint he filed in the 2017 DeKalb Lawsuit and, later, in this case. But Milani's other filings here and in the 2017 DeKalb Lawsuit are replete with admissions that themselves, together with all reasonable inferences therefrom, prove Milani's continued involvement in the conspiracy through today by virtue of his ownership or control over the Lake Lanier Property.

I.    **Milani Admits That the Lake Lanier Property is his "After Acquired Property"**

On December 18, 2017, the Milani Defendants filed in the 2017 DeKalb Lawsuit that certain "Defendants Fred Milani, MHB Homes, LLC, Portofino at Lake Lanier, LLC, and Hadi Homes, Inc.'s Motion to Open Default and Brief in Support" (the "Motion to Open Defaults"), a true and correct copy of which is was attached to FXM's Request for Status Conference [Dkt#47, pp18-52]. Relying on the Milani Discharge Order, the Milani Parties contended in their Motion to Open Defaults (bold emphasis added):

> A defendant meets the requirement of setting forth a meritorious defense by showing that if relief from default is granted, "the outcome of the suit may be different from the result if the default stands." *Exxon Corp. v. Thomason*, 269 Ga. 761, 504 S.E.2d 676, 677 (1998). **Here, Defendants have pled Milani's Chapter 7 discharge bars Plaintiff's claims**. See Answer at Affirmative Defenses 2-5, 7. **Milani has been discharged of personal liability on Plaintiff's claims. See Ex. A. Therefore, Plaintiff cannot recover against Milani**. See 11 U.S.C. § 524(a).
>
> **This is also true even if Milani subsequently acquired the assets of the administratively-dissolved MHB Homes and Portofino LLCs, as such property constitutes after-acquired property shielded from prepetition debts under the Chapter 7 discharge**. *See Fonesca*, 542 B.R. 628, 638 (1st Cir. BAP 2015). Plaintiff failed to object to any transfers or discharges in the bankruptcy Court. Therefore, Plaintiff is estopped from asserting those claims now, and Plaintiffs doing so violates the permanent injunction entered with the Chapter 7 discharge.

Hadi Homes establishes the meritorious defense that Plaintiff has failed to state a claim against it upon which relief can be granted. Specifically, Plaintiff seeks to satisfy its lien against Milani through assets of Hadi Homes.

[Dkt#47, p22].

In that same motion to open default, Milani stated (bold and underline emphasis added):

Defendant Milani obtained a Chapter 7 discharge July 08, 2015. See July 08,. 2015 Discharge of Debtor, attached hereto as Exhibit A. Plaintiff seeks entry of default judgment establishing liability for pre-petition debts and transfers. Plaintiff's claim was scheduled in Defendant Milani's Chapter 7 bankruptcy. See Amended Schedule D, attached hereto as Exhibit B, at 1. According to the Amended Schedule, the debt forming the basis of Plaintiff's claim - namely, an O.C.G.A. § 9-15-14 lien for attorney's fee - was incurred on October 10, 2013. See id. **Plaintiff failed to object to any of the now-complained-of transfers in the time outlined by the bankruptcy court.** Plaintiff also failed to object to the discharge within the time outlined by the bankruptcy court. See Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines attached hereto as Exhibit C. **Plaintiff now seeks to establish personal liability of Defendant Milani and proceed after his after-acquired property consisting of the assets of the now-defunct MHB Homes and Portofino LLCs, which were both administratively dissolved on December 7, 2016, and reverse-pierce the corporate veil of an unrelated entity, Had (sic) Homes, Inc., to recover corporate assets for the alleged personal liability of Milani.** Plaintiff's actions violate the permanent injunction established by the Chapter 7 discharge and are contrary to Georgia law.

[Dkt#47, pp19-20]

On December 20, 2017, FXM filed in the 2017 DeKalb Lawsuit that certain Plaintiff's First Notice to Take the Deposition of Defendant Fred Milani for Limited Purposes (the "December 2017 Deposition Notice") in which FXM sought to take Milani's deposition on January 5, 2018 "for the limited purpose of discovery in relation to [the Motion to Open Defaults]." On January 2, 2018, Milani filed in the 2017 DeKalb Lawsuit a motion seeking a protective order that "neither the deposition of Defendant Milani noticed for January 5, 2018 nor any other deposition of Defendant Milani shall be taken at any time or for any purpose without prior leave of Court and modification of this Order" and stating (with bold and underline emphasis added):

**Plaintiff's suit simply presents another legal question: Whether Plaintiff, a creditor whose claims admittedly accrued on October 10, 2013, whose claims were scheduled in the bankruptcy, and who failed to object to any transfers during the bankruptcy or object to the discharge may now maintain an action to hold Milani personally liable for this prepetition debt.** The answer is clearly: No. *See In re Meadows*, 428 B.R. 894, 911 (Bankr. N.D. Ga. 2010).

**Plaintiff similarly may not hold Milani personally liable for prepetition debts or use <u>Milani's after-acquired property</u>, if any, to satisfy Plaintiff's lien.** "'[A] lien cannot be created in the absence of an underlying obligation.' Because the affixing of a creditor's lien against a debtor's property is based upon the existence of a debt as the personal liability of the debtor, **once the personal liability is extinguished, the lien 'does not survive the discharge, does not affix [to] and cannot affect the after acquired property.'"** *In re Yawn*, 2015 WL 4939962 at *1 (quoting *In re Marshall*, 204 Bankr. 838, 840 (Bankr. S.D. Ga. 1997)) (alteration in original). **Therefore, Plaintiff has no need to depose Milani regarding the distribution of assets from the now-defunct LLCs, which were dissolved over three years after Plaintiff's claim for fees accrued. <u>To the extent Plaintiff's suit seeks to foreclose on this property now belonging to Milani, Plaintiff has violated the discharge injunction</u>.** See id. (quoting Jarrett v. Ohio Dept. Of Taxation (In re Jarrett), 293 B.R. 127, 132 (Bankr. N.E. Ohio 2002)) ("[When a creditor seeks to renew a prepetition lien so as to bring within the lien's scope property acquired by a debtor postpetition (a.k.a. after acquired property), courts uniformly find that a violation of the discharge injunction of §524 has occurred.")(alterations in original).

**The fact Plaintiff manufactured new allegations related to alleged fraud and conspiracy after March 12, 2015 in Paragraph 222 of Plaintiff's Complaint changes nothing.** To avoid the preclusion of the discharge, Plaintiff baldly alleges Milani participated in certain postpetition transfers in March 2015 which harmed Plaintiff. Plaintiff's allegation defies reason.

[Dkt#47, pp55-56]. Milani's *in judicio* admissions in the 2017 DeKalb Lawsuit and here, provide ample evidence that Milani does, indeed, either directly, indirectly, legally or beneficially, own the Lake Lanier Property. But FXM has no intention of relying solely on such admissions because that is not going to be the only evidence supporting FXM's allegations that, after March 12, 2015, Milani re-joined the conspiracy that he had master minded prior to his bankruptcy filing to cheat FXM out of the Earned Fee.

### V.  What is the Conspiracy & How to Prove Milani Participated After March 12, 2015?

### A.    Milani Contends that FXM Fails to Allege Any Post-Petition Acts

Milani's early pleadings after being served with the Complaint (i.e. the pleadings he filed

when he was most likely to speak truthfully - and before he had truly lawyered up) relied on the

theory that FXM could not possibly enforce its lien against the Lake Lanier Property because that

property was **Milani's "after-acquired property."**  On <u>December 7, 2017</u>, in Milani's first pleading

filed anywhere after being served with the Complaint and written discovery in the 2017 DeKalb

Lawsuit, Milani also alleged in his *ex parte* motion seeking to re-open this case and support his

failure to timely file an answer and responses to discovery that "the complaint fails to allege any

**specific actions** by Debtor on or after March 12, 2015." (emphasis added)

In his motion for summary judgment filed in this Court on August 13, 2018, Milani stated

(with bold emphasis added):

> In addition to the counts asserted against Milani, **Respondents assert that Milani is
> the alter ego of MHB Homes, Portofino, Hadi, and Diamond Island**. . . . In three
> of the eight counts, Respondents inserted boilerplate language acknowledging that
> Milani had filed for bankruptcy but asserting, **without any specific facts**, that:
>
> > Because **Milani took actions after March 12, 2015 to participate,
> > ratify, and gain the benefit of the conspiracy** that resulted in the
> > [wrongful and fraudulent foreclosures or fraudulent conveyances] the
> > FXM Law Firm seeks a judgment against him personally to the fullest
> > extent permitted under applicable bankruptcy law.
>
> SOUMF, ¶18.
>
> Despite this language, **there are no facts set forth in the Complaint about Milani's
> alleged post-petition acts to "participate, ratify, and gain the benefit of" the
> alleged pre-petition conspiracy.  SOUMF, ¶18.  The reason is that there were no
> such post-petition acts committed by Milani**.

[Dkt#79-1, pp5-6].  Later in that same pleading, Milani stated:

In their written responses to Debtor's discovery, **Respondents were unable to identify a single post-petition fact that formed this "conspiracy" other than Debtor's failure to answer the Original Complaint and Debtor's alleged failure to provide documents and discovery responses establishing that the conspiracy exists**. SOUMF, ¶31. The reason such documents were not produced is that Debtor's **counsel has previously informed Respondents that Debtor has no such documents**. SOUMF, ¶33.

· · ·

Respondents did not respond to . . . requests by the undersigned attorney for Debtor to identify whether they did, in fact, have responsive documents, and if so, when they would be produced.  SOUMF, ¶34.  Through the date of this Motion, **Respondents have not produced a single document, or pointed to a single scintilla of evidence, supporting their allegations that Debtor participated in a post-petition conspiracy**.  SOUMF, ¶35.

[Dkt#79-1, pp9-10]

Milani is wrong in characterizing the allegations in the Complaint, but he is so painfully right that FXM will not be able to come up with all of the relevant evidence so long as Milani and his cohorts can prevent it.  Thus, this motion.

**B.**    **The Law of Conspiracy & the Bankruptcy Doctrine of "Returning to the Fray"**

According to the Georgia Court of Appeals:

The law is that a conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. Where it is sought to impose civil liability for a conspiracy, the conspiracy of itself furnishes no cause of action. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the Plaintiff and the resulting damage. Where the act of conspiring is itself legal, the means or method of its accomplishment must be illegal. As quoted recently by the Georgia Supreme Court from earlier cases: A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means.

The essential element ... is the common design.... And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto ... as if he had been an original member. It is this second statement from Cook that SCAD relies upon to impute liability for acts committed before July 29, 1992. The statement comports with the general theory of conspiracy law in the United States. See 15A C.J.S. § 19 and *Chemetron Corp. v. Business Funds*, 682 F.2d 1149,

1180 (5th Cir.1982), which refers to this as an "immemorial common-law principle" and cites several cases including *Blackstone Indus. v. Andre*, 232 Ga. 715, 208 S.E.2d 815 (1974). (some citations & quotations omitted with bold emphasis added).

*Savannah College of Art & Design, Inc. v. School of Visual Arts of Savannah, Inc.*, 219 Ga. App. 296, 297 (1995). In what the Georgia Court of Appeals also calls an "immemorial common-law principle"

> a conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. The essential element ... is the common design.... And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto ... as if he had been an original member.

Id. This concept finds an analogous principle in the expression "re-joining the fray" that has been applied in cases rejecting claims for bankruptcy discharge violations.

In *Siegel v. Federal Home Loan Motg. Corp.*, 143 F. 3rd 525 (9th Cir. 1986) that Court ruled that Freddie Mac's enforcement of an attorney fee provision for post-petition litigation by the debtor did not violate the discharge injunction, writing (bold emphasis added and internal quotes omitted):

> This is a case where the debtor, Siegel, had been freed from the untoward effects of contracts he had entered into. Freddie Mac could not pursue him further, nor could anyone else. **He, however, chose to return to the fray and to use the contract as a weapon. It is perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him.**
>
>                                         . . .
>
> **Bankruptcy was intended to protect the debtor from the continuing costs of pre-bankruptcy acts but not to insulate the debtor from the costs of post-bankruptcy acts.**

*Siegel v. Federal Home Loan Motg. Corp.*, 143 F. 3d 525, 533 (9th Cir. 1986). *See also, In re Ybarra*, 424 F.3d 1018, 1024 (9th Cir. 2005) (After determining that the debtor had "returned to the fray," stated that "[w]e have also endorsed the notion that by voluntarily continuing to pursue

litigation post-petition that had been initiated pre-petition, a debtor may be held personally liable for attorney fees and costs that result from that litigation.")

Milani initiated his conspiracy to cheat FXM prior to filing bankruptcy, but he continued his participation in that conspiracy after he filed bankruptcy. Similar to *Siegel* and *Yberra*, Milani "rejoined the fray" and cannot use what is very much appearing to be an ill-gotten discharge to prevent FXM from following the asset (the Lake Lanier Property) and its owner (Milani).

Based on this law of conspiracy, Milani's activities have to be divided between "pre-petition Milani" and "post-petition Milani." The actions of the first may have been discharged[3], but the actions of the second were not. If, as FXM has alleged, Milani formed and participated in a conspiracy to cheat FXM prior to March 12, 2015, but then continued taking actions in furtherance of that same conspiracy, then, at the very least, his liability for his post-petition activities was not discharged in his bankruptcy case.

Based on Eleventh Circuit Court of Appeals Jury Instructions (regarding a RICO conspiracy) and roughly tailored to this case, a federal jury in Atlanta could be charged on the law as follows:

> **A "conspiracy" is an agreement by two or more people to commit an tortious act. Put another way, it's a kind of partnership for tortious purposes. Every member of the conspiracy becomes the agent or partner of every other member.** FXM doesn't have to prove that all the people named in the complaint were members of the conspiracy – or that those who were members made any kind of formal agreement. The heart of the conspiracy is the making of the unlawful plan itself. And FXM doesn't have to prove that the conspirators were successful in carrying out the plan.
>
> **While the essence of a conspiracy is an agreement to further an endeavor that, if completed, would satisfy all the elements of a substantive tort violation, FXM doesn't have to offer direct evidence of an agreement. The conspiracy's existence can be inferred from the participants' conduct.** But a defendant must objectively

---

[3] Respondents expect to file an adversary proceeding for declaratory judgment in relation to this and other issues on which they are uncertain and require guidance from this Court to protect them from any uncertainty as to actions which do or do not implicate Milani's discharge injunction.

manifest, through words or actions, his/her/it's agreement to participate in the enterprise's affairs. **FXM doesn't have to show that the alleged members of the conspiracy entered into any express or formal agreement, or that they directly stated the details of the scheme, its object, or purpose, or the precise means by which the object or purpose was to be accomplished.** FXM also doesn't have to establish that all the means or methods alleged to carry out the alleged conspiracy were, in fact, agreed on, or that all the means or methods that were agreed on were actually used or put into operation. And FXM doesn't have to prove that all persons alleged to be conspiracy members were actually members or that alleged conspirators succeeded in accomplishing their unlawful objectives.

**A defendant can become a member of a conspiracy without knowing all the unlawful scheme's details or without knowing the names and identities of the other alleged conspirators.** If FXM proves by a preponderance of the evidence that a particular defendant has knowingly joined the alleged conspiracy, **it doesn't matter that said defendant may not have participated in the alleged conspiracy or scheme's earlier stages.** Mere presence at the scene of some transaction or event, or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, doesn't necessarily prove the existence of a conspiracy. A person who doesn't have knowledge of a conspiracy, but who happens to act in a way that advances some object or purpose of conspiracy, doesn't become a conspirator.
FXM doesn't have to prove that a defendant actually committed any of the acts that any defendant may have agreed to commit to establish his/her/its membership in the conspiracy.

To determine whether there was a conspiracy, you must consider all the evidence in the case. If you find that there was a conspiracy, then you can attribute the statements or acts of the other participants in the conspiracy to each of the defendants.

A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *American Dental Ass'n. v. Cigna Corp.*, 605 F. 3d 1283, 1293 (11th Cir. 2010) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). **A plaintiff may establish an "agree[ment] to the overall objection" by "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity."** *United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995).

In proving a conspiracy, FXM is not required to "offer direct evidence of an agreement; the existence of [the] conspiracy 'may be inferred from the conduct of the participants.'" *American Dental Ass'n.*, 605 F.3d at 1283.

**C.    How to Prove a Co-Conspirator's Participation**

With this as a background, the next logical question is how FXM can prove Milani's participation in an actionable conspiracy. The case of *Nottingham v. Wrigley*, 221 Ga. 386, 388 (1965) is instructive.

> The law recognizes the **intrinsic difficulty of proving a conspiracy**. The **conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances**. To show conspiracy, **it is not necessary to prove an express compact or agreement to the parties thereto**. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects. **It is sufficient that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design. Also, where transactions between relatives are under review, slight circumstances are often sufficient to induce belief on the part of a jury that there was fraud or collusion for a conspiracy**. (bold emphasis added)

With this in mind, the answer as to how a conspiracy is proved is simple . . . investigation and discovery. A full and complete investigation will include obtaining witness/informant interviews, statements, and depositions. It would also require the procurement of physical and electronically stored information to include, but not be limited to: **(a)** entity formation and governance documents; **(b)** bank records; **(c)** financial statements; **(d)** contracts/agreements; **(e)** communications; **(f)** telephone records; **(g)** documents evidencing communications (e.g. letters, memos, email, text messages, and other similar means of electronic communications); **(h)** statements; **(i)** regulatory filings; **(j)** accounting records (e.g. invoices, accounts payable/receivable reports, general ledgers, general journals, financial statements, etc.); **(k)** state and federal income and payroll tax returns; **(l)** property tax returns; **(m)** real estate development and marketing documents; **(n)** actual and deemed admissions in pleadings, letters, depositions, and other documents; and **(o)** anything and everything

that could provide information that could be used to prove the existence of an agreement between two or more people to defraud FXM.

Long before the exponential increase in physical documentation and the electronically stored information age, Justice Lumpkin aptly observed "I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory, ever bestowed on mortal man." *Miller v. Cotton*, 5 Ga. 341, 349 (1848). That invites a return to the issues of Milani's conduct in discovery.

## VI.  Obstruction of Discovery in 2017 DeKalb Lawsuit by Milani and Lu Defendants

### A.     Milani's Extensive Office, Administrative and Professional Services Support

Starting in <u>October 2008</u>, FXM began to represent Milani and his various alter ego limited liability companies and corporations, primarily in defending Milani and his entities from collection lawsuits. This representation involved the investigation, drafting and finalizing of written responses made under oath to post-judgment discovery which required extensive communication with Mr. Milani and his in-house accountant and the review of tax returns, bank statements, and other financial documents. Through these representations, Moore came to know that Milani's in-house accountant and administrative supervisor was **Ehson Shayan**, a 2007 Graduate of Georgia State University's J. Mack Robinson College of Business with a Bachelor of Business Administration in Accounting. An April 2018 view of Mr. Shayan's LinkedIn profile included the following:

> Accountant
> Milani Homes, Inc
> Jan 1999 – Present • 19 yrs 4 mos
> Manage all financial transactions, posting debits and credits, reconcile and balance accounts, producing financial statements, and recording all transactions. Prepare management reports and financial summaries using Microsoft Excel and Peachtree Accounting detailing company's financial status. Handle cash inflows and outflows of over a million dollars a week. Manage payroll and prepare payroll tax returns. Research and resolve billing disputes with vendors.

Key Contributions:
Supported a significant increase in productivity levels by streamlining accounting processes. Prepared and delivered to management, under extremely quick turnaround timelines, accurate monthly, quarterly, and annual financial statements.

In addition, in his schedules filed in this case in 2015, Milani stated that his outside accountants for the "past 35 years" were "**Birnbrey, Minsk, Minsk, & Perling, LLC**, 1801 Peachtree Road Northwest, Atlanta, Georgia 30309." Furthermore, Milani has been represented for at least the last 20 years by the law firm of **Morris Manning & Martin** - which representation continues through today.

In short, for at least the last 20 years, Milani has had sophisticated in-house and outside accountants and lawyers at his beck and call - and some willing to provide aid and comfort to him in devising, implementing and consummating his fraudulent schemes and transactions. Despite having this loyal, capable and malleable stable of advisors, as Respondents observed on more than one occasion, Milani often times feigned to be a mere rube - incapable of knowing what is going on and forced, even, to hire non-attorney's to file one of his bankruptcy cases for $150. Just like many things, he has done, these tactics were all part of Milani's sham fumbling persona. What is true, however, is that Milani has a veritable mountain of documents that are responsive that he claims he does not have or has thrown away.

**B.    FXM's Discovery in 2017 DeKalb Lawsuit**

Because FXM already knew a great deal about Milani's finances and infrastructure and methods of operation by virtue of his prior years of representing them, FXM prepared a set of written discovery for each of the Milani Parties and had it served on them with the summons and Complaint. The written discovery included interrogatories tailored to elicit information such as: **(a)** identities of the owners/members/stockholders/officers/managers/board members of the various entities; **(b)**

the facts supporting the Milani Parties' defenses; **(c)** the identity of persons with knowledge of such defenses; **(d)** the documents supporting such defenses; **(e)** the identity and credentials of any and all experts; **(f)** a list of documents not being produced based on privilege or work product doctrine; **(g)** agreements entered into after June 1, 2013; **(h)** communications with PNC Bank or RBC Bank after June 1, 2013; **(i)** information regarding electronic devices (i.e. computers, smart phones, etc.) purchased, leased or used; **(j)** grounds for any denials of any portion of requests for admissions; **(k)** rights to acquire other entities or properties; and **(l)** agreements with Jacquelyn Reese in relation to the White House.

The request for documents sought, among other relevant things: **(a)** documents requested to be listed or described in the interrogatories; **(b)** files relating to the Lake Lanier Project; **(c)** documents referenced in preparing answers to the Complaint; **(d)** documents supporting any and all defenses to the Complaint; **(e)** communications with others such as PNC Bank, RBC, Guaranty Capital, Abraham, Diamond Island, Diamond Cementer, Atlanta White House, X-Lu, etc.; **(f)** documents relating to any expert; **(g)** organizational documents; **(h)** income tax returns; **(i)** property tax returns; **(j)** loan applications; **(k)** bank records; **(l)** laptop/desktop/smartphone (for mirror image creation); **(m)** title commitments/policies; **(n)** emails/memos; **(o)** documents relating to the Dock Permits; and **(p)** documents relating to the sale, conveyance, or assignment of the Dock Permits, the Personal Property.

After Milani defaulted, FXM sought the entry of a default judgment against Milani. Later, the Milani Parties filed their motions to open their defaults. When FXM sought to take Milani's deposition for the limited purpose of examining the basis for such motions, Milani sought and obtained a protective order in reliance on the re-opening of this case. None of the Milani Parties

have provided any written responses to FXM's interrogatories or requests for production of documents served in the 2017 DeKalb Lawsuit, nor have they produced a single document.

**C.    Milani Obstructs Discovery in the 2017 DeKalb Lawsuit**

In successfully preventing the taking of his deposition in the 2017 DeKalb Lawsuit, Milani suggested that the Superior Court, like this Court had purportedly done by entering its *ex parte* re-opening order, "should similarly discourage further harassing behavior from Plaintiff [and] enter a protective order prohibiting [FXM] from taking Milani's deposition prior to the bankruptcy court ruling on sanctions for Plaintiff's conduct and prior to opening default." [Dkt#47, p54] On January 12, 2018, the Superior Court entered a protective order [Dkt#47, pp61-62], ordering that:

> neither the deposition of Defendant Milani notices for January 5, 2018 nor any other deposition of Defendant Milani shall be taken in this case at any time or for any purpose until the Bankruptcy Court of the Northern District of Georgia rules on Defendant Milani's Motion for Sanctions filed in *In re Milani*, No. 15-54748 (Bankr. N.D. Ga. March 12, 2015), said motion having been filed on or around January 3, 2018.

**D.    X-Lu and Diamond Island Also Obstruct Discovery in the 2017 DeKalb Lawsuit**

On October 6, 2017, X-Lu and Diamond Island (collectively referred to herein as the "Lu Defendants") were also served with detailed discovery at the same time they were served with the summons and Complaint in the 2017 DeKalb Lawsuit. The Lu Defendants timely filed answers and later served pleadings which purported to be responsive to the written discovery requests. Not surprisingly, the Lu Defendants' *modus operandi* in responding to discovery mirrors that of the Milani Parties.

To date, however, neither of the Lu Defendants have produced a single document requested by FXM. Moreover, they have refused to provide highly relevant information. The responses given

below are simply examples of the wholly improper, evasive, non-responsive, and obstructive

positions taken by the Lu Defendants in responding to FXM's interrogatories.

**Interrogatory No. 2**: Identify each and every member and managing agent for MHB Homes, Portofino, Hadi Homes, Diamond Island, Diamond Cementer, HLN Homes, Guaranty Capital during the period from the date of the entities' formation through the date of your responses to these interrogatories.

Response: Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Interrogatory No. 4**. Describe in detail all statutes, codes, regulations, legal principles, standards and customs or usages, and illustrative case law which you contend are applicable to this action.

Response: Defendant objects to this Interrogatory because it is overbroad and not at all calculated to lead to the discovery of admissible evidence, though it may lead to the applicable law relevant to this case which is not a permissible subject of discovery.

**Interrogatory No. 5**. For each person known to you or reasonably believed by you to have knowledge or information concerning the allegations in the complaint or the denials or defenses in your Answer in this action: (a) identify each such person; (b) provide a summary of the facts or information known or reasonably believed by you to be known by such person; and (c) identify, list and describe each and every document supporting or refuting such facts, allegations or assertions.

Response: Defendant objects to this Interrogatory because it is overbroad, unduly burdensome and duplicative of other requests herein, including document requests. Subject to and without waiving these objections, Defendant is aware and believes that the following people have or may have knowledge or relevant information regarding the allegations of the Complaint: Fred Milani, William Abraham, Frank X. Moore, and Xiangtong Lu, and representatives of the various corporate Defendants.

**Interrogatory No. 10**. Have any of you had any communications with PNC Bank or RBC-REFI on or after June 1, 2013? If so, for each such communication: (a) state the date it occurred; (b) describe the method of communications (i.e. phone, in person, email, text, tweet, etc.); (c) identify the other participant(s); and (d) state or describe the substance of those communications.

Response: Defendant objects to this Interrogatory because it is overly broad and not at all calculated to lead to the discovery of relevant evidence. Subject to and without

waiving these objections, Defendant is unaware of any communications related to the subject matter of the instant case.

**Interrogatory No. 11**. Have any of you had any communications with Guaranty Capital or Abraham on or after June 1, 2013? If so, for each such communication: **(a)** state the date it occurred; **(b)** describe the method of communications (i.e. phone, in person, email, text, tweet, etc.); **(c)** identify the other participant(s); and **(d)** state or describe the substance of those communications.

Response: Defendant objects to this Interrogatory because it is overly broad and not at all calculated to lead to the discovery of relevant evidence. Subject to and without waiving these objections, Defendant has not had any responsive communications that are related to the allegations or defenses in this case.

**Interrogatory No. 22**. For each and every agreement that you have (or ever had) with Milani in relation to the Lake Lanier Project: **(a)** if any part of such agreement was not in writing, state in detail all of the terms and conditions thereof; **(b)** state in detail the terms of that agreement; **(c)** identify all of the persons who negotiated, arrived at, or memorialized the terms of such agreement or otherwise participated in the consideration or approval of such agreement; **(d)** identify, list and describe each and every document that evidences such agreement; and **(e)** identify, list and describe each and every document evidencing any communication you had with others regarding such agreement.

Response: Defendant objects to this Interrogatory because it has exceeded more than 50 interrogatories (including subparts), the amount allowed by the Georgia Civil Practice Act, Section 9-11-33(a)(1). Subject to and without waiving this objection, Defendant is willing to answer this Interrogatory should Plaintiff narrow its Interrogatories to conform to the Act.

These few examples make it readily apparent that the Lu Defendants grossly overused objections such as "over broad," "over burdensome," and "not at all calculated to lead to the discovery of relevant evidence."

The responses given below are simply examples of the wholly improper and obstructive positions taken by X-Lu and Diamond Island in responding to FXM's requests for production of documents.

**Document Request No. 3**. Produce any and all documents reviewed or referred to by you in preparing your answer to the Complaint and any counterclaims.

Response:  Defendant objects to this request on the grounds that it invades the attorney- client privilege and/or work-product and trial preparation documents.

**Document Request No. 14**.  Produce any and all documents which evidence any communications you (or any of the representatives of you or any of your affiliates) had on and after June 1, 2013 by or between you and Abraham or any of his representatives, attorneys, affiliates, or agents.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Defendant will produce documents related to the acquisition of the property at issue in the Complaint at a time and place mutually convenient to counsel for all parties.

**Document Request No. 7**.  Produce any and all documents which evidence any communications you (or any of the representatives of you or any of your affiliates) had on and after June 1, 2013 by, between or among you and any representatives for PNC Bank.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Defendant is unaware of any documents reflecting any communications with PNC Bank or any of its representatives that relate to the allegations in the Complaint or defenses to the claims in the Complaint.

**Document Request No. 8**.  Produce any and all documents supporting or refuting any affirmative, special or other defenses asserted in your answer to the Complaint or upon which you intend to rely in denying liability for the allegations and claims in the Complaint.

Response:  Defendant objects to this request on the grounds that it invades the attorney- client privilege and/or work-product and trial preparation documents. Subject to and without waiving these objections, Defendant will produce documents responsive to this request at a time and place mutually convenient to counsel for all parties.

**Document Request No. 9**.  Produce any and all documents which evidence any communications you (or any of the representatives of you or any of your affiliates) had on and after June 1, 2013 by, between or among you and any representatives for Guaranty Capital.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of

admissible evidence. Subject to and without waiving these objections, Defendant will produce documents reflecting any communications with Guaranty Capital related to the specific property that is at issue in the Complaint at a time and place mutually convenient to counsel for all parties.

**Document Request No. 20**.  Produce any and all documents which evidence any communications you (or any of the representatives of you or any of your affiliates) had on and after June 1, 2013 by or between you and Abraham.

<u>Response</u>:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Defendant will produce documents related to the acquisition of the property at issue in the Complaint at a time and place mutually convenient to counsel for all parties.

**Document Request No. 25**.  Produce your Articles of Incorporation

<u>Response</u>:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 26**. Produce your Operating Agreement.
<u>Response</u>:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 27**.  Produce your By-Laws.

<u>Response</u>:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 28**.  Produce your Financial Statements for the each of the years that you existed during the Relevant Period.

<u>Response</u>:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 31**.  Produce your Income Tax Returns for the years from 2014 through 2016.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 32**. Produce your Property Tax Returns for the years from 2014 through 2016.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 33**.  Produce your Bank Records for the period from January 1, 2014 through the date of your response to these requests for documents.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 34**.  Produce any and all applications you have made since January 1, 2014 for any loans or investment cash.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 35**. Produce any and all of your Financial Statements for the period from January 1, 2014 through the date of your response to these requests for documents.

Response:  Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Again, the requests clearly sought relevant documents, yet the Lu Defendants simply refused, without any legitimate basis at all, to produce them.  Instead, they hid behind formulaic incantations of the broadest and most inapplicable objections.

The following are examples of the Lu Defendants' abject bad faith in responding to requests for admissions served in the 2017 DeKalb Lawsuit.

**Admission No. 14**.  Admit that none of the claims asserted against you in the Complaint are barred, in whole or in part, by discharge of bankruptcy.

Response:  Defendant objects to this Request because it calls for a legal conclusion not within the scope of subsection (b) of Code Section 9-11-26 of the Georgia Civil Practice Act. Defendant further objects to this Request because it requires Defendant, through counsel, to narrate the legal reasons why it pleaded in its first responsive pleading the contrary proposition of what the Request calls to admit, which itself is an inappropriate use of requests for admission. Defendant further objects to this Request because it calls upon Defendant, through counsel, to reveal attorney client communications or research or analysis subject to the work product privilege, which is not a permissible object of discovery. Defendant further objects that for these reasons, no entry in a privilege log as to these matters is required or even possible under the Georgia Civil Practice Act.  Defendant further objects to this Request because it, along with the various putative instructions, effectively causes Defendant to draft a motion to dismiss or motion for summary judgment as to this matter to deny the Request, which is not required in the discovery phase. Subject to and without waiving any of these or any general objections, this Request is denied.

**Admission No. 16**.  Admit that none of the claims asserted against you in the Complaint are barred, in whole or in part, by duress.

Response:  Defendant objects to this Request because it calls for a legal conclusion not within the scope of subsection (b) of Code Section 9-11-26 of the Georgia Civil Practice Act. Defendant further objects to this Request because it requires Defendant, through counsel, to narrate the legal reasons why it pleaded in its first responsive pleading the contrary proposition of what the Request calls to admit, which itself is an inappropriate use of requests for admission. Defendant further objects to this Request because it calls upon Defendant, through counsel, to reveal attorney client communications or research or analysis subject to the work product privilege, which is not a permissible object of discovery. Defendant further objects that for these reasons, no entry in a privilege log as to these matters is required or even possible under the Georgia Civil Practice Act.  Defendant further objects to this Request because it, along with the various putative instructions, effectively causes Defendant to draft a motion to dismiss or motion for summary judgment as to this matter to deny the Request, which is not required in the discovery phase. Subject to and without waiving any of these or any general objections, this Request is denied.

**Admission No. 32**.  Admit that you conspired with some or all of the other Defendants to cheat and defraud Plaintiff.

Response:  Defendant objects to this Request because it calls for a legal conclusion not within the scope of subsection (b) of Code Section 9-11-26 of the Georgia Civil Practice Act. Defendant further objects to this Request because it requires Defendant,

through counsel, to narrate the legal reasons why it pleaded in its first responsive pleading the contrary proposition of what the Request calls to admit, which itself is an inappropriate use of requests for admission. Defendant further objects to this Request because it calls upon Defendant, through counsel, to reveal attorney client communications or research or analysis subject to the work product privilege, which is not a permissible object of discovery. Defendant further objects that for these reasons, no entry in a privilege log as to these matters is required or even possible under the Georgia Civil Practice Act. Defendant further objects to this Request because it, along with the various putative instructions, effectively causes Defendant to draft a motion to dismiss or motion for summary judgment as to this matter to deny the Request, which is not required in the discovery phase. Subject to and without waiving any of these or any general objections, this Request is denied.

Notably, in its initial discovery to the Lu Defendants, FXM included the following interrogatory which is followed by the Lu Defendants' response.

**Request No. 15:**  If your response to any separately numbered request for admission included below was or is intended to be other than a full, unequivocal and unqualified admission: (a) state each and every fact which forms the basis of your denial; (b) identify each and every person having knowledge or information supporting or refuting each such denial; and (c) list and describe any and all documents supporting or refuting each such denial.

**Response:**  Defendant objects to this Interrogatory because it is overly broad, duplicative of other requests, not at all calculated to lead to the discovery of relevant evidence, and because its form seeks to impose any obligation in answering Requests for Admission beyond that which is called for to an answer to a request for admission under the Georgia Civil Practice Act.

That the Lu Defendants are mimicking Milani's obstreperous and obstructionist behavior in responding (actually - not responding) to discovery is, in and of itself, evidence from which a fact finder could conclude that the Lu Defendants and the Milani Parties have been and continue to be co-conspirators.  And, when it comes to discovery, these co-conspirators know that their only hope for avoiding the consequences of such participation is to stonewall discovery and thereby prevent Respondents from obtaining the detailed evidence that will establish the Lu Defendants' and the Milani Parties' continued participation in the conspiracy to cheat FXM and defeat its Attorney Lien.

In furtherance of that strategy, in the 2017 DeKalb Lawsuit, the Lu Defendants refused to participate in a meet and confer session if it was going to be either transcribed or recorded. The Lu Defendants' failures were so egregious and continuing that on March 24, 2018, FXM filed a motion for imposition of immediate sanctions or, in the alternative, for an order compelling full and complete responses and the production of the requested documents. That motion was not heard until September 24, 2018 following which the Superior Court entered an order on October 8, 2018 (**Exhibit 22**) denying the motion and directing the parties to:

> exercise good faith and professionalism in the discovery process. Should a legitimate dispute arise and require discovery motions, e.g., motions to compel or motions for protective orders, all procedural requirements must be met.

A meet and confer session was scheduled and begun on November 15, 2018, however, once again, the Lu Defendants' attorney, F. Skip Sugarman, refused to participate if that conference was transcribed or recorded. He also assigned his junior associate to conduct the meet and confer session with the undersigned - even though the associate had not even prepared the discovery responses and would make no representation as to his knowledge of the information and documents his client had and was refusing to provide or produce.

FXM provided a pre-formulated document which contained Meet & Confer Questions for each Interrogatory including the following: **(a)** Why is this overly broad and unduly burdensome; **(b)** How do you propose to narrow the request to address your objections as to over breadth and unduly burdensome; **(c)** Explain why you say this is not reasonably calculated to lead to admissible evidence; **(d)** What information are you withholding based on the expressed objections; **(e)** Will you withdraw these objections; **(f)** Will you supplement this response & when; **(g)** Are you withholding information or documents based on a privilege; **(h)** If so, what are the bases on which you rely to prevent the disclosure of the information or the production of documents; **(i)** Will you provide a

privilege log that will include a listing of any document as to which you are asserting a privilege or doctrine and other information as required by the rules; and **(j)** If so, when?

FXM never got past the first two questions relating to Interrogatory No. 1 to Diamond Island, LLC. When asked question (a) (Why is this overly broad and unduly burdensome?), Mr. Hawk stated, among other things, that: **(a)** Diamond Island answered the interrogatory; **(b)** it was "[FXM's] burden to establish its responses were deficient" [an alleged burden that FXM failed to meet]; and **(c)** the Lu Defendants "[were] not going down this path." Mr. Hawk was reminded that the burden was on the Lu Defendants to justify and explain their objections upon which they relied to obstruct the provision of information or documents requested in FXM's written discovery based on the following law cited in FXM's reply brief in further support of FXM's motion for immediate sanctions filed on September 23, 2018.

> Objections should state the specific reason a specific interrogatory is improper. Purdom, Wayne M., *Georgia Civil Discovery*, §12.11 (2017-2018 ed.) (Citing generally 8A Wright & Miller: *Federal Practice & Procedure* §§2173-74 (Thomson West, 2007) ("The responding party has both the burden of specifying the grounds of the objection and the burden of persuasion as to the validity of the objection."). Georgia Courts require an objecting party to make a showing of how the interrogatory is improper, and a general objection that the interrogatory is "irrelevant and immaterial" is improper. See *Munn v. Munn*, 116 Ga. App. 297, 299 (157 SE2d 77 (1967).

In short, very early into the session, Mr. Hawk made it clear that the Lu Defendants would not participate in good faith in a Rule 6.4 session in which they were expected to provide specific responses to the pre-formulated questions designed to elicit what the law requires of a reluctant respondent to discovery. Given the gross lack of co-operation, FXM ended that session to again seek and obtain direction from the Superior Court.

The bottom line is that over 14 months after serving the Lu Defendants with written discovery in the 2017 DeKalb Lawsuit, they have produced not one single piece of paper nor have they provided any meaningful responses to the written discovery. In other words - and not surprisingly, the Lu Defendants are treating discovery in the same nonchalant manner as Milani in this litigation.

## VII.    Milani's Discovery Abuses Here

### A.    FXM's Efforts to Obtain Information & Documents

The history of Respondents' efforts to obtain discovery from Milani up through March 14, 2018 has been thoroughly and exhaustively set forth in Respondents' Motion to Compel Discovery filed that date [Dkt#63 with Exhibits at Dkt#63-1 through Dkt#63-15] (the "First Motion to Compel"). That motion, its requests for relief and its exhibits are incorporated as if fully set forth herein.

### B.    Milani's Deposition

While Milani's and his former counsel's misconduct was described in some detail in the First Motion to Compel, in light of FXM's continued investigation, the following testimony is particularly important:

> **Q.  Who owns the property, Lake Lanier project property?**
>
> **A.  I don't know.**
>
> Q.  You don't know?
>
> A.  Nope.  Absolutely no.
>
> **Q.  Are you doing any work at the Lake Lanier property?**
>
> **A.  No.  Absolutely no.**
>
> Q.  Who owns it?
>
> A.  I don't know.

. . .

Q.  Do you own it?

A.  No.  I told you absolutely no.

Q.  Okay.  So who does own?

A.  You should check it and find it out.  I don't know.  They foreclose on me.

Q.  You're under oath you know.

A.  Huh?

Q.  You are under oath.

A.  Amen.  I believe in it.  And I don't own it.  I don't have nothing to tell.

**Q.  And you don't know who owns it.  Is that what you're saying under oath?**

**A.  Yes.  Whoever own it, bought it, they know.  I don't know what happened
after foreclose.**

Milani Depo. (February 20, 2018), at pp. 14-15 [Dkt#63-14].  In this testimony, Milani states under

oath that as to the Lake Lanier project property: **(a)** he doesn't own it; **(b)** he doesn't know who

owns it; and **(c)** he was not doing any work at it.  He also testified as follows:

**Q.  Have you had anything to do with the property since March 12, 2015?**

**A.  Absolutely no.**

**Q.  Nothing?**

**A.  Absolutely no.**

**Q.  You haven't entered any contracts with any engineers?**

**A.  Absolutely no.**

Q.  What happened to all those papers that you took from me, from your office, all the
plans and all the engineer studies and all the -- the homeowner association papers.
What did you do with those?

A.  I throw it out.

Q.  You threw it out?

A.  Yes.

Q.  When did you do that?

A.  After foreclosure I threw it out.

> **Q.  So you have absolutely nothing to do --**
>
> **A.  Absolutely no.**
>
> **Q.  -- with that Lake Lanier property?**
>
> **A.  How many times -- I'm not going to answer you anymore.  You asked me 15 times.**

Milani also testified that he does not do any business with X-Lu anymore.  Id. p22.   Later on pages

38-39, Milani testified as follows:

> Q.  You do business with  Mr. Lu, right?
>
> A.  No.
>
> Q.  When was the last time you did business with Mr. Lu?
>
> A.   After the -- before you bought Lake Lanier I cut my relationship.  I built two houses for them. It was before.
>
>                 . . .
>
> A.  Yes.  He bought a house from me.
>
> Q.  He did more than that for you.
>
> A.  No.
>
> Q.   Well, he loaned the money to help you buy  the White House on the foreclosure steps, didn't he?
>
> A.  No.

In this portion of his testimony, Milani: **(a)** denies that he does business with X-Lu; **(b)** claims that

the last time he did business with X-Lu was when he built two houses for them; and **(c)** denies that

he borrowed money to buy the White House on the foreclosure steps.

When Milani was asked whether the Dock Permits had been foreclosed on, he testified  "I

don't know.  They foreclosure (sic) the Lake Lanier.  I didn't have anything to do with it after that."

Id. p44.  According to Milani, "[a]fter foreclosure, I didn't have nothing to do with the Lake Lanier

property."  Id. p81.  Milani also emphatically denied having "any business that ongoing related in

any way to the Lake Lanier 222 plus or minus acres." Id. p86.

When asked what his reported income was on his income tax returns, Milani testified that it was $50,000 for 2017 and about the same for 2016. Id. p104. On his Statement of Financial Affairs filed in this case [Dkt#1, p6] Milani reported an income of $8,332 for the partial year up to March 12, 2015 with an income of $50,000 for the year 2014.

**C.    Milani's Responses to Written Discovery & Single Piece of Paper Production**

Milani's initial responses to written discovery contained hardly any information. Instead, based on the following objections, he gave scant, if any, meaningful responses:

> 1.  "Debtor objects to [interrogatory/request for documents/request for admission No.X] on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case."
>
> 2.  "Debtor objects to [interrogatory/request for documents/request for admission No.X] because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time."
>
> 3.  "Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information."
>
> 4.  "Debtor further objects that he is not in possession of the information sought by Respondent."
>
> 5.  "Debtor further objects to [interrogatory/request for documents/request for admission No.X] on the grounds that the information request[ed] was previously provided in Debtor's bankruptcy Petition and Schedules."
>
> 6.  "Debtor objects to [interrogatory/request for documents/request for admission No.X] because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time."
>
> 7.  "Debtor further objects to [interrogatory/request for documents/request for admission No.X] because respondent already possession [sic] the information sought."

As for producing documents, Milani produced only one single piece of paper - a check for $50,000 from Milani to the law firm of Balch & Bingham. According to his deposition testimony, Milani got

the $50,000 from a family trust of which he was a beneficiary and which he had listed in his

bankruptcy schedules as being the YFM Family Trust having a value of $0.50 [Dkt#1, p17].

## D.    New Counsel Fails to Cause a Change in the Milani Discovery M.O.

With new counsel making an appearance, Respondents were hopeful that Milani would

change his *modus operandi*, so they consented to an order denying that motion without prejudice to

give new counsel an opportunity to get Milani right with the process [Dkt#67].   In that Order, the

Court included the following:

> 3.  On or before April 20, 2018, Debtor's new counsel shall meet and confer with
> Respondents' counsel in the Atlanta area in the presence of a court reporter (to be paid
> for, at least initially, by Respondents) to work diligently and in good faith to address
> and attempt to resolve all of the issues that have been raised regarding [Debtor's]
> discovery responses (or lack thereof);

> 4. The Motion to Compel is hereby DISMISSED without prejudice, with Respondents
> retaining the right to refile it, or so much of it that remains necessary, depending on the
> outcome of the above-referenced Court-ordered meet and confer session; and

> 5.  The parties and their counsel are hereby reminded of their obligations under all
> applicable laws and rules governing discovery that are applicable in this contested
> matter proceeding.

After the Court's order, counsel agreed to meet and confer on <u>April 6, 2018</u> in the Bankruptcy

Courthouse with a court reporter present.  Frustrated by what now appears in hindsight to have been

an intentional decision by Ms. Humnicky to neither read, understand, or remember any of the

extensive correspondence, pleadings, or other relevant communications between Respondents and

Mr. Clapp, in preparing for the meet and confer session, Respondents prepared a 72 page letter[4]

---

[4]  A 72-page letter sounds like a very lengthy document, however, as explained in an email
to Ms. Humnicky, the first 16 pages simply included a summary of information in prior pleadings
and communications with Mr. Clapp.  At least 40-45 pages were merely repetitions of Respondents'
discovery requests followed by Milani's initial responses.  The rest of the pages were comprised of
the deficiencies in the responses and demands for supplementation and withdrawal of objections.

(**Exhibit 23**), the purpose of which was summarized in its first paragraph:

> I write in anticipation of our meet and confer discovery dispute session that has been
> ordered by the Court in its Order entered : (**a**) provide the procedural history and many
> of the substantive communications I had with Mr. Clapp; (**b**) describe the claims and
> requests for relief raised by Mr. Milani in these proceedings; (**c**) recite statements made
> in pleadings filed by Mr. Milani in the companion litigation in the DeKalb Superior
> Court proceedings; (**d**) recite the notices that we have given Mr. Milani of the denials
> of his allegations and the defenses the Respondents intend to rely upon; and (**e**)
> reiterate the deficiencies in the discovery responses and deposition of Mr. Milani.

Just before leaving to make the two-hour drive from Blue Ridge to the Richard B. Russell Building

counsel had the following email exchange:

### Email from FXM to AMH on Fri, Apr 6, 2018, at 7:24 a.m.

> Anna,  I started to prepare for our meet and confer session this morning by creating a
> working memo.  I soon realized that it would provide a good format for me to educate
> you on the long and frustrating chain of communications I had with Mr. Clapp and to
> give us a template for discussing and hopefully resolving the various deficiencies that
> I had pointed out and discussed with Mr. Clapp in our communications.  With that in
> mind, please see the attached.  **I know that it is a lengthy document, primarily
> because, for your convenience and mine, I have included my complete requests,
> your complete response and then a description of the deficiencies.**
>
> **If you like, I am willing to postpone our meet and confer session that is scheduled
> for 10 am at the Courthouse.  If that is what you want to do, please let me know
> ASAP, as I am about to start driving to Atlanta from Blue Ridge.**  Thanks. FXM

### Email from AMH to FXM on Fri, Apr 6, 2018, at 7:49 a.m.

> If you postpone this meeting, I can't meet until the week of April 16th. You sent me a
> 71 page letter at 7:24 am and want an immediate response.
>
> I have gone through, reviewed every request and response and drafted a draft
> supplemental response.  I also read the deposition transcript.  **I am ready for the
> meeting**.
>
> I am not prepared to go over your 71 page letter that you sent me 20 minutes ago,
> which I would need to discuss with Mr. Clapp before addressing with you.
>
> Mr. Milani is out of town until next week, as is Mr. Clapp.  I also need time to
> complete the supplemental responses.
>
> My suggestion is to agree to a reasonable deadline for me to complete the
> supplemental responses and get Mr. Milani's verification.  Then we can confer, after
> you've seen the supplemental responses and I've had time to address the 71 page letter.

I would suggest April 18th for the supplemental responses, because my week is packed next week, and we can confer on the 19th or 20th, or ask the Court for one more week, in that I recall you said you're busy that week. If we ask for an additional week, I ask for a deadline of the 20th for the supplemental responses because April 16th is the first day of my new firm and there's lots to do between now and then, with a full caseload. Anna

### Email from FXM to AMH on Fri, Apr 6, 2018, at 8:57 a.m.

Anna, I got your message and turned around to come back to the office to discuss this with you. **First of all, I see no need to postpone the meet and confer, but I don't want to waste a trip to Atlanta if you are going to refuse to participate. While my letter is long, there is nothing in it that is new or surprising.** Indeed, the **first 16 pages simply includes information that you have already seen, read and presumably studied** in preparation for our conference including: **(a)** information that has already appeared in the documents filed in this case; **(b)** the contents of my email and letter communications with Charles Clapp; **(c)** a listing of and more detailed reasons why the general objections relied upon by Mr. Milani are bogus and baseless (i.e. this is based primarily on an email that I sent to Mr. Clapp on February 13th, so it is not new); **(d)** a repetition of our discovery requests juxtaposed to Mr. Milani's initial responses (which probably comprises at least **40-45 pages**); and **(e)** a written expression of the deficiencies relative to each interrogatory, request for documents and request for admissions that I was fully prepared to simply put on the record before the court reporter this morning as part of the conference.

**Because I had already created the work product and template for making the meet and confer go more smoothly, I simply decided to share my work-product with you before the meeting. That you would try to suggest that the letter is a surprise that justifies the postponement of the meet and confer is disappointing - especially because I prepared that document to make our conference more pointed, more productive and shorter.** Notably, while I have been expecting to receive something from you in advance of the conference which addressed the numerous deficiencies that I had already pointed out in my motion to compel, apparently you decided not to do that, but to instead present whatever responses you had at the conference.

I urge you to look again at the template/letter/memo and confirm what I am telling you. I am not willing to wait any longer. I am willing to postpone the conference until later in the day. Please let me know what time works best for you. As long as I have 2 hours notice, I will be there. I would, however, appreciate a prompt response, as we called and have the court reporter on hold until we get clarification. Thanks. FXM

### Email from AMH to FXM on Fri, Apr 6, 2018, at 9:00 a.m.

Frank - I am walking out the door to meet you at 10 am as scheduled.

I never refused to proceed. I said I was ready to go on everything but the letter.

I have a 2 pm meeting at Galleria. I have to leave the Courthouse at 1:30 pm.

I will be waiting for you in Cafeteria.  Anna

**Email from FXM's Office to AMH on Fri, Apr 6, 2018, at 10:14 a.m.**

Ms. Humnicky,  Would you mind meeting the court reporter to let her into the building or would you prefer for her to wait until Mr. Moore arrives?

**Email from AMH to FXM's Office on Fri, Apr 6, 2018, at 10:17 a.m.**

She is here at Mr. Moore's request and expense. He will be coming in the same entrance so it makes sense that he escort her up.

I am trying to review on my phone the 71 page letter than Mr. Moore sent me at 7:24 this morning. Anna

Respondents' agreed  to withdraw their motion to compel and for sanctions for Milani's and Mr. Clapp's gross misconduct in Milani's deposition.  Respondents agreed to travel from Blue Ridge to downtown Atlanta to attend a meet and confer session for which they agreed to advance payment to have reported.  Respondents also shared a time consuming work-product document offered in good faith to help Ms. Humnicky and make the Court-ordered conference more efficient.

In exchange, Ms. Humnicky took (or pretended to take) offense that she got the 72-page work product letter, then used the delivery of that helpful letter to create confusion as to whether the conference would or could go forward.  Knowing full well that Moore was enroute, she sent an email which caused Moore to return to the office until the issue of whether the conference would go forward could be resolved - thereby causing a delay in the start of the conference from 10 a.m. to 11:13 a.m. Without telling Respondents in advance, Ms. Humnicky announced at 9:00 a.m. on the morning of the conference that she "had to leave at 1:30 p.m." And, in refusing to greet and allow the court reporter to enter the building and set up while Moore was traveling from Blue Ridge, she churlishly announced that "[s]he is here at Mr. Moore's request and expense. He will be coming in the same entrance so it makes sense that he escort her up."

As portended by the email exchange and Ms. Humnicky's game-playing - and as explained and demonstrated below, the conference was unproductive - to say the least.

1. <u>No After Acquired Property</u>. At the beginning of the conference, Ms. Humnicky repeatedly stated that Milani had "no after-acquired property related to Portofino or MHB Homes or the Lake Lanier Property." See Transcript of the April 6, 2018 Meet and Confer Session (**Exhibit 24**) (the "M&C Transcript") at pp6-11. According to Ms. Humnicky, the reference made by Milani's attorneys to after-acquired property was "simply - - you know - - a legal argument made by the attorneys that filed that pleading in DeKalb County. It is simply argument, and there is no after-acquired property." Id. p11.

2. <u>Milani's Ownership Interests</u>.    Rather than deal with the global invocation of objections, Ms. Humnicky insisted that each objection had to be considered within the context of each and every interrogatory, request for production of documents, or request for admission. The Deficiency Letter included the following regarding the ownership of various entities:

> **Interrogatory No. 2**: Identify each and every member and managing agent for MHB Homes, Portofino, Hadi Homes, Diamond Island, Diamond Cementer, HLN Homes, Guaranty Capital during the period from the date of the entities' formation through the date of your responses to these interrogatories.
>
> Response: Debtor objects to Interrogatory No. 2 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information. Debtor further objects that he is not in possession of the information sought by Respondent. Debtor submits that Debtor was the member for MHB Homes, Portofino, and Hadi Homes. Sirous Hadi was also a former member of MHB Homes, Portofino, and Hadi Homes, but Mr. Hadi died September 19, 2017.
>
> Deficiencies: According to Mr. Milani and his attorneys, after he filed bankruptcy, he acquired the 222 Acres comprising the Lake Lanier Property and, therefore, FXM's attempt to assert its lien against that property is a violation of the discharge injunction.

When FXM's Attorney's Lien was filed in Hall County, the owners of the 222 Acres were MHB Homes, Portofino or Hadi Homes. Consequently, discovering the identity of the members and managing agents for these three entities during the described period is most definitely calculated to lead to admissible evidence in this contested proceeding. In addition, the current title holder of most or all of the 222 Acres that Mr. Milani claims as "after-acquired property" is Diamond Island. Clearly, learning the identity of the members and managing agent for Diamond Island during the described period is calculated to lead to admissible evidence. For a short time after FXM filed its Attorney's Lien, Guaranty Capital was also a record title owner (a straw man) of all or most of the 222 Acres until it conveyed that property to Diamond Island. Clearly, learning the identity of the members and managing agent for Guaranty Capital during the described period is calculated to lead to admissible evidence. As for HLN Homes, that entity may have or has been in the control of Mr. Milani and may have had involvement in the 222 Acres since September 30, 2013. Clearly, learning the identity of the members and managing agent for HLN Homes during the described period is calculated to lead to admissible evidence.

Demand is hereby made that, within ten (10) days from the date of our meet and confer, Mr. Milani withdraw his baseless objections to this interrogatory, provide all of the information that he has withheld based on those objections, and provide a full and complete response to this interrogatory.

The colloquy regarding Interrogatory No. 2 took place at pages 37-39 of the M&C Transcript. In summary, the position taken by Ms. Humnicky was that the information sought was "outside the scope of discovery other than to Hadi Homes." Id. Consistent with this narrow view, Milani's supplemented response to interrogatories [Dkt#82, pp92-112] (as to which a verification was attached) was as follows:

Supplemental Response: Subject to the objections and responses in the Original Response specific to this Interrogatory, Milani supplements his objections as follows: the interrogatory is unduly burdensome and overly broad to the extent that the time frame exceeds the relevant time period at issue in this matter, as well as Respondents have such information for the pre-petition time period, as it relates to MHB Homes, Portofino, and Hadi Homes. **Milani further supplements his response to add that he, Milani, does not possess any knowledge, information or documents regarding the members or managing agents of Diamond Island, Diamond Cementer, HLN Homes and/or Guaranty Capital. Milani has never had a legal or beneficial interest, directly or indirectly, in Diamond Island, Diamond Cementer, HLN Homes and/or Guaranty Capital.**

[Dkt#82, p94][5]   Milani's supplemental response represents the continuation of his earlier obstreperous, unreasonable, evasive, and incomplete responses.  Instead of providing a full and complete response to the question, Milani dodges this interrogatory by claiming that the time frame exceeds the relevant time period at issue in this matter and that FXM already knows the answer as to the pre-petition time period as it relates to MHB Homes, Portofino and Hadi Homes.

    3.  <u>Persons with Knowledge or Information</u>.  The Deficiency Letter included the following regarding the ownership of various entities:

> **Interrogatory No. 3**: For each and every person known to you or reasonably believed by you to have knowledge or information concerning the allegations in the Motion for Contempt: **(a)** identify each such person; **(b)** provide a summary of the facts or information known or reasonably believed by you to be known by such person; and **(c)** identify, list and describe each and every document supporting or refuting such allegations in the Motion for Contempt.

> <u>Response</u>: Debtor objects to Interrogatory No. 3 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case.  Debtor further objects that he is not in possession of the information sought by Respondent. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information.   Debtor further objects to Interrogatory No. 1 on the grounds that the information request was previously provided in Debtor's bankruptcy Petition and Schedules.  Debtor objects to Interrogatory No. 3 because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time.

> Subject to and without waving the foregoing objections, Debtor offers the following: Balch & Bingham, P.C. Debtor submits the lawsuit 14CV11938-10 and resulting FiFa, in addition to the lawsuit 17CV10275, are evidence of discharge injunction violations.

> <u>Deficiencies</u>: Among others, Mr. Milani included the following allegations in his Motion for Contempt: **(1)** *"FXM filed a complaint against Debtor (and other Defendants), alleging fraud, conspiracy, collusion, bad faith, civil theft, etc., based*

---

[5] In pleadings captioned "Movant Fred Milani's Supplemental Response to First and Second Set of Document Requests from Respondents" [Dkt#82, pp113-131] and "Movant Fred Milani's Second Supplemental Response to First and Second Set of Document Requests from Respondents" [Dkt#82, pp132-135] Milani purported to supplement his initial responses to Respondents' requests for production of documents.

*upon actions that primarily took place between on (sic) 2008 and 2014; **(2)** All
allegations in FXM's complaint contain elements relating back to actions prior to this
bankruptcy, and therefore fall under the protection of the permanent discharge
injunction from 11 U.S.C. §524; (3) As a result of FXM's actions, Debtor has suffered
and continues to suffer actual damages including attorney fees for defending the State
Court action and extreme emotional distress; and **(4)** FXM's actions as set forth
herein constitute a willful violation of the discharge injunction granted to Debtor.*

Interrogatory No. 3 is specifically designed to seek information regarding these very
same allegations. In this response, Mr. Milani relies on his bogus bundle of baseless
objections that are clearly designed to evade, dissemble, and avoid providing relevant
and material information that is at the heart of his claims of contempt. **In both
informal written requests and now this formal interrogatory, Respondents are
asking Mr. Milani and his attorneys to answer the very simple question of what
it is about FXM's complaint and amended complaint in the 2017 DeKalb Lawsuit
that constitutes a violation of the discharge injunction.** In his other pleadings, Mr.
Milani states that FXM is violating the discharge injunction by attempting to assert lien
or other rights against Mr. Milani's "after-acquired property." While Mr. Clapp
studiously avoided answering this question in my informal inquiries, this interrogatory
represents a formal effort to get the same information. Yet, once again, Mr. Milani stiff
arms and obstructs Respondents' search for the facts.

Demand is hereby made that, within ten (10) days from the date of our meet and
confer, Mr. Milani withdraw his baseless objections to this interrogatory, provide all
of the information that he has withheld based on those objections, and provide a full
and complete response to this interrogatory.

At the M&C Conference, Ms. Humnicky promised to supplement Milani's response and later

provided the following supplemental response:

Supplemental Response: Subject to the objections and responses in the Original
Response specific to this Interrogatory, except to the extent Milani withdraws his
objection that he is not in possession of the information requested, **Milani
supplements his objections to state that he is not required to provide Respondents
with each and every detail that could possibly exist in the universe of facts.** See
*IBP, Inc. v. Mercantile Bank*, 179 FRD 316, 321 (D. Kan. 1998). Subject to the
foregoing, Milani supplements his response to add that Respondents and their agents,
Milani, Milani's former bankruptcy counsel, Charles Clapp, and his current bankruptcy
counsel, Anna M. Hurnnicky, as well as all of the parties, their attorneys, and the
Court, related to the two DeKalb County Superior Court actions initiated by
Respondents (1 4CV11938 and 17CV10275), have knowledge regarding those two
actions, as well as the U.S. Bankruptcy Court and the Chapter 7 Trustee have
knowledge regarding Milani's bankruptcy case and pre-petition assets, all which form
the basis of Milani's Motion for Contempt in this Court. Milani further states that his
doctors have knowledge regarding his heart and other health/mental issues which

occurred as a result of the stress caused by the 2017 lawsuit. Dr. Jokhadar treated
Milani related to the heart issue. Dr. James O'Keefe has treated Milani related to other
more minor stress related issues.

[Dkt#82, pp94-95]

Milani re-opened his bankruptcy case and sought to hold Respondents in contempt.  In this

interrogatory, Respondents were eliciting information as to "the very simple question of what it is

about FXM's complaint and amended complaint in the 2017 DeKalb Lawsuit that constitutes a

violation of the discharge injunction." Milani's supplemental response does nothing to answer this

question.  Instead, Milani asserts a new objection and theory of avoidance - claiming that "he is not

required to provide Respondents with each and every detail that could possibly exist in the universe

of facts." Notably, in his deposition, Milani was equally unhelpful. See, e.g. Milani Depo. at pp5-7,

19,  92-95, 108-112.

    4.  <u>After-Acquired Property Relating to MHB Homes and Portofino</u>.  With Milani,  his

bankruptcy lawyer, and his non-bankruptcy lawyers all claiming that the Lake Lanier Property was

Milani's after-acquired property and that Respondents' efforts to enforce a lien against it was a

violation of the discharge injunction, Respondents included the following interrogatory which is

followed by Milani's initial response and the notice given to Milani of its deficiencies.

**Interrogatory No. 5**: This interrogatory seeks information regarding the following
excerpt from the pleading you filed on December 18, 2017 in the FXM Second
Lawsuit captioned as "Defendants Fred Milani, MHB Homes, LLC, Portofino at Lake
Lanier, LLC, and Hadi Homes, Inc.'s Motion to Open Default and Brief in Support"
(the "Milani Motion to Open Default"):

*Here, Defendants have pled Milani's Chapter 7 discharge bars
Plaintiff's claims. See Answer at Affirmative Defenses 2-5, 7. Milani has
been discharged of personal liability on Plaintiff's claims. See Ex. A.
Therefore, Plaintiff cannot recover against Milani. See 11 U.S.C.
§524(a).*

*This is also true even if Milani subsequently acquired the assets of the administratively-dissolved MHB Homes and Portofino LLCs, as such property constitutes after-acquired property shielded from prepetition debts under the Chapter 7 discharge . See Fonesca, 542 B.R. 628, 638 (lst Cir. BAP 2015). Plaintiff failed to object to any transfers or discharges in the bankruptcy Court. Therefore, Plaintiff is estopped from asserting those claims now, and Plaintiff's doing so violates the permanent injunction entered with the Chapter 7 discharge . (bold emphasis added)*

For each and every asset that you acquired from the "administratively-dissolved MHB Homes and Portofino LLCs" which you contends (sic) is "after-acquired property shielded from prepetition debts under the Chapter 7 discharge:" **(a)** state the date of such acquisition; **(b)** state the consideration given by you to MHB Homes or Portofino for such acquisition; **(c)** identify each and every person who effected, documented, suggested, encouraged, advised, assisted, or participated in any way in such acquisition; **(d)** list and provide the amount of each and every debt owed by MHB Homes or Portofino on the date of such acquisition including the name of the creditor and the amount of the debt for each such creditor; **(e)** identify each and every attorney who you consulted with or sought assistance from in relation to such acquisition; **(f)** identify each and every person who you told about such acquisition and state when you told them; **(g)** identify each and every person known to you or reasonably believed by you to have knowledge or information concerning said acquisition; **(h)** provide a summary of the facts or information known or reasonably believed by you to be known by such person identified in the foregoing subsection (g); **(i)** identify, list and describe each and every document evidencing or relating to said acquisition; **(j)** describe in detail all statutes, codes, regulations, legal principles, standards and customs or usages, and illustrative case law which under which you contend in the foregoing excerpt that **(i)** either or both of the Respondents were required to object to such acquisition or transfer in the 2015 Bankruptcy Case or be barred or estopped from doing so later, or **(ii)**; and, objecting to or challenging such acquisition, by either of the Respondents "violates the permanent injunction entered with the Chapter 7 discharge;" **(k)** recite each and every instance or circumstance in which you disclosed such asset acquisition to the Chapter 7 trustee, Denise Dotson, Esq., or to the creditors you listed or scheduled in your 2015 Bankruptcy Case.

Response: Debtor objects to Interrogatory No. 5 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case. Debtor further objects that he is not in possession of the information sought by Respondent. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information. Debtor further objects to Inerrogatory (sic) No. 5 on the grounds that the information request was previously provided in Debtor's bankruptcy Petition and Schedules. Debtor objects to Interrogatory No. 5 because discovery is ongoing in this case, and Debtor is not yet in

a position to provide all of the requested information at this time. Debtor submits that, to his knowledge, all Portofino and MHB Homes' assets were foreclosed.

<u>Deficiencies</u>: Once again, in response to a carefully crafted interrogatory that goes right to the heart of the allegations that Mr. Milani has made in characterizing the alleged discharge violations by Respondents, Mr. Clapp/Mr. Milani indiscriminately recites his litany of conjured-up and baseless objections and having blown that smoke, uses it to evade his obligations to provide the information requested.

Demand is hereby made that, within ten (10) days from the date of our meet and confer, Mr. Milani withdraw his baseless objections to this interrogatory, provide all of the information that he has withheld based on those objections, and provide a full and complete response to this interrogatory.

At the M&C Conference, the following colloquy took place regarding this interrogatory:

MS. HUMNICKY: I will supplement that by withdrawing all general objections and all specific objections made to this one except to the extent that we may need -- I may find something out. I may find that there was a pencil that Mr. Milani acquired, but -- you know -- **but to my knowledge, he hasn't acquired anything. If I discover something, I will certainly supplement this response and provide you anything relevant, but to date, the supplemental response will say that he did not acquire any property from the administratively dissolved MHB Homes and/or Portofino, LLCs to his knowledge and understanding. All assets belonging to those two entities were subject to the bank's lien and were foreclosed upon in 2014.**

MR. MOORE:  Needless to say, you know and I know that I'm not interested in pencils.  I've got a $6 million dollar attorney fee lien on 222 acres at Lake Lanier; so I'm not -- I don't care about a pencil.

MS. HUMNICKY:  Okay.

MR. MOORE:  I mean --

MS. HUMNICKY:  **His understanding is that every single asset of those two entities were  foreclosed upon by the bank in 2014.  If we discover something different during this process, we will let you know.**

MR. MOORE:  Well, **I will tell you that I know as I sit here that that's simply not true.  For example, we have defined the term "personal property" and I've defined that in my discovery, and he knows, and I know that the bank did not foreclose and take all the plans. They did not take all the specifications. They did not take all the studies. They didn't take  any of that stuff, nor did they take the dock permits. In fact, the dock permits are valuable now because they don't give out any more dock permits.**

MS HUMNICKY: My understanding from the deposition testimony is that Mr. Milani threw all that away, and he no longer has those documents.

MR. MOORE:  He threw all that away?

MS. HUMNICKY:  That was what he testified to, I believe, in the deposition.

MR. MOORE:  So I'm not going to find Mr. Milani out there -- you know -- dealing with any of these contractors and trying to start up another project or anything like that?

MS. HUMNICKY:  Not on that property, no.  The bank foreclosed upon it.  It was sold to other entities.  I presume that those entities -- you know -- did what they needed to do to resurrect the dock permits and –

MR. MOORE:  Is he prepared to -- I'm sorry.  I interrupted you.

MS. HUMNICKY:  You made me lose my train of thought.

MR. MOORE:  Sorry.  You were talking about dock permits.

MS. HUMNICKY:  I assume the new -- whoever purchased it -- you know -- recreated whatever they needed, got the dock permits resurrected or whatever they did.  He has no interest in those those entities.  You need to talk to them.

MR. MOORE:  But Mr. Milani knows what relationship he has to Diamond Island and Mr. Lu.

MS. HUMNICKY:  He has none.

MR. MOORE:  He had none?

MS. HUMNICKY:  None.

MR. MOORE:  That's a lie.  You're not lying, but if Mr. Milani is telling you that, that's a lie.

MS. HUMNICKY:  Well, you're going to have to bring some evidence to the Court that he's lying about that because he doesn't have an interest in them.

MR. MOORE:  He has no relationship, no business relationship with Mr. Lu; is that what Mr. Milani is saying?

MS. HUMNICKY:  There are so many names, I'd have to go back.  I think there was one --

MR. MOORE:  Mr. Lu.  He's the big money man.

MS. HUMNICKY:  I'm trying to remember.  There was something prepetition that went on with him, I believe, because I changed one of the answers last night as I was reading through the deposition.  I read that Mr. Lu had had some interactions with him, but I believe it was all prepetition.

M&C Transcript, pp43-47. Following this colloquy, Milani provided the following:

Supplemental Response:    Milani withdraws his specific objections to this Interrogatory, except to the extent that discovery is on-going and Milani may need to further supplement this response. **Milani supplements his response to add that he did not acquire any property from the "administratively-dissolved MHB Homes and Portofino LLCs." To his knowledge and understanding, all assets belonging to those two entities were subject to the bank's lien and were foreclosed upon in 2014.**

As shown below, this information is both incomplete and false.

5. Agreements Milani Entered Into After June 1, 2013.  In seeking to discover information and documents establishing that Milani entered into agreements in relation to the Lake Lanier Property, Respondents included the following interrogatory which is followed by Milani's initial response and the notice given to Milani of its deficiencies.

**Interrogatory No. 10**: This interrogatory seeks information relating to each and every agreement that you have entered into on or after June 1, 2013 in relation to all or any portion of the 221.2295 Acres, the Lake Lanier Project, the Pre-Foreclosure Lake Lanier Project, or the Post-Foreclosure Lake Lanier Project including, but not limited to, the RBC-REFI/Guaranty Capital Purchase Agreement, the Guaranty Capital/Diamond Island Agreement, the RBC-REFI/Milani Agreements, the Guaranty Capital/Milani Agreements, the Guaranty Capital/RBC-REFI Agreements, the Guaranty Capital/Diamond Island Agreement, or the Milani/Lu Agreements: **(a)** state in detail the terms of such agreement and whether such terms are in writing or oral; **(b)** identify all of the persons who negotiated, arrived at, or memorialized the terms of such agreement or otherwise participated in the consideration or approval of such agreement; **(c)** identify, list and describe each and every document that evidences such agreement; and **(d)** identify, list and describe each and every document evidencing any communication you had with others regarding such agreement.

Response: Debtor objects to Interrogatory No. 10 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case. Debtor further objects that he is not in possession of the information sought by Respondent. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information. Debtor objects to Interrogatory No. 10 because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time.  Debtor again submits he has not acquired any interest in the 221.2295 Acres.

Deficiencies: First of all, the term "agreement" or "agreements" were defined in the First Written Discovery as meaning "any accord, understanding, arrangement, or

exchange of promises reached between or among parties, whether oral or written."
With this in mind, this interrogatory required Mr. Milani to provide information with
respect to each and every agreement that he entered into on or after June 1, 2013 in
relation to all or any portion of the 221.2295 Acres, the Lake Lanier Project, the
Pre-Foreclosure Lake Lanier Project, or the Post-Foreclosure Lake Lanier Project.
Rather than provide a full, complete and truthful answer to this interrogatory, Mr.
Milani instead asserts bogus objections and then evades and dissembles, answering
"Debtor again submits <u>he has not acquired any interest in the 221.2295 Acres</u>."
(underline emphasis added)

Demand is hereby made that, within ten (10) days from the date of our meet and
confer, Mr. Milani withdraw his baseless objections, provide all of the information that
he has withheld based on those objections, and provide a full, complete and truthful
response to this interrogatory.

In the M&C Conference, Ms. Humnicky committed to providing a supplemental response and

reiterated that "other than [the 9/30/13 Settlement Agreement], Mr. Milani did not enter into any

agreements regarding the 221.2295 acres, any or all, a portion of it, the Lake Lanier project either

pre- or post-foreclosure."  M&C Transcript, p54.  Milani later provided the following verified

supplement.

> <u>Supplemental Response</u>: Milani withdraws his objections to this specific Interrogatory.
> Milani supplements his response to add that settlement negotiations were conducted
> with the bank pre- foreclosure, which Respondents are aware of. However, **Milani did
> not enter into any agreements regarding the 221.2295 Acres (all or any portion
> thereof), the Lake Lanier Project, the Pre- Foreclosure Lake Lanier Project or
> the Post-Foreclosure Project, on or after June 1, 2013.**

Dkt#82, p98. This information is patently and completely false.

   6. <u>Communications With PNC Bank, RBC, and Other Co-Conspirators</u>.  Seeking to establish

that Milani had communicated with PNC Bank and RBC after the Settlement Agreement was

executed, FXM included the following interrogatory, the response to which, followed by the

deficiency appear below.

> **Interrogatory No. 11**:  Have any of you had any communications with PNC Bank or
> RBC-REFI on or after June 1, 2013? If so, for each such communication: **(a)** state the
> date it occurred; **(b)** describe the method of communication (i.e. phone, in person,

email, text, tweet, etc.); **(c)** identify the other participant(s); and **(d)** state or describe the substance of those communications.

<u>Response</u>: Debtor objects to Interrogatory No. 11 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case. Debtor further objects that he is not in possession of the information sought by Respondent. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information. Debtor objects to Interrogatory No. 11 because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time. Subject to and without waives the foregoing objections, Debtor responds: None.

<u>Deficiencies</u>:  If Mr. Milani is testifying under oath and under penalty of perjury that he has not had any communications with PNC Bank or RBC-REFI on or after June 1, 2013, then his answer would appear to be responsive.  Whether it is true or not is another question.  Nevertheless, if his is a full, complete, and truthful response to this interrogatory, then there should be no reason whatsoever to assert the everything-but-the-kitchen-sink panoply of baseless objections.

Demand is hereby made that, within ten (10) days from the date of our meet and confer, Mr. Milani withdraw his baseless objections, provide all of the information that he has withheld based on those objections, and provide a full, complete and truthful response to this interrogatory.

At the M&C Conference, counsel had the following colloquy regarding this response.

MR. MOORE: . . . **So the trouble that I have is on the one hand he says he has none --**

MS. HUMNICKY:  **Uh-huh (affirmative).**

MR. MOORE:  **-- but on the other, he refuses to give me his telephone records. And I have a little bit of a problem with someone who says  trust me because I'm telling you the truth. You don't need documents.**


MS. HUMNICKY:  That goes back to the cases I cited.  He says that he did not have any – knows for certain he had no communications with the bank post-foreclosure. Obviously, pre-foreclosure there could have been some communications. He doesn't have any documents reflecting those because he typically doesn't communicate in writing.  He may have had some phone conversations.  Certainly, again, your office may have. I'm sure he got foreclosure notices and whatnot, but he doesn't have any of those documents. **And, again, the Court, under the case law I cited to you, is required to believe that unless you have some evidence that it is not true.**  We will supplement the response to say that he knows for sure he didn't talk to them post-foreclosure, and there's this -- you know -- six-month period where there may

have been communications. It was five years ago. He doesn't recall any, but there may have been some, and he has no documents reflecting that.

MR. MOORE: Well, I stand on my request. I stand on my demand.

MS. HUMNICKY: Okay. I stand on my response.

M&C Transcript, pp56-57. Later, Milani provided the following supplemental response.

> Supplemental Response: Milani withdraws his specific objections to this Interrogatory except that discovery is on-going and Milani may need to further supplement this response. Milani supplements his response to add that Milani does not recall any communications with PNC Bank or RBC-REFI between June 1, 2013, and the date of the foreclosure sale of the Lake Lanier Project in 2014. Milani adds that he never had any communications, written or oral, with PNC Bank or RBC-REFI, on or after the date of the foreclosure sale in 2014, except to the extent his counsel may have communicated with PNC Bank's or RBC-REFI's counsel related to the 2017 lawsuit.

[Dkt#82, p99] Seeking evidence that would establish whether Milani had made calls to PNC Bank, RBC or any others in relation to the Lake Lanier Property, Respondents included the following request for documents which is followed by Milani's response, a description of the deficiency.

> **Interrogatory No. 12**: For each and every computer or other electronic device with email capabilities (including, but not limited to Blackberries or cell phones) you (or, if you are not a natural person) your representative(s) identified in any of the responses to these interrogatories has purchased, leased or used during the Relevant Period state: **(a)** the current location (including address); **(b)** the make, model and serial number; **(c)** Internet and/or cell phone service provider(s) during the Relevant Period; and **(d)** the address of any and all electronic mail account(s) including service provider(s).

> Response: Debtor objects to Interrogatory No. 12 on the grounds that it is unduly burdensome, overly broad, and not likely to produce discoverable information material to this case. Debtor further objects that he is not in possession of the information sought by Respondent. Debtor further objects that Respondent already possesses some of the information requested, and therefore production of such would be redundant, or could just as easily obtain the requested information. Debtor objects to Interrogatory No. 11 (sic) because discovery is ongoing in this case, and Debtor is not yet in a position to provide all of the requested information at this time.

> Deficiencies:        This is a blatantly non-responsive answer. Demand is hereby made that, within ten (10) days from the date of our meet and confer, Mr. Milani withdraw his baseless objections, provide all of the information that he has withheld based on those objections, and provide a full, complete and truthful response to this interrogatory.

Supplemental Response:    Milani withdraws his specific objections   to this
Interrogatory  except to the extent that it is unduly burdensome, overly broad, and not
likely to lead to discoverable information. Milani further objects to Interrogatory No.
12 to the extent it seeks information which is not relevant to any party's claim or
defense, is not proportional to the needs of the case, considering the importance of the
issues at stake in the action, the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of the discovery in
resolving the issues, and whether the burden or expense of the proposed discovery
outweighs its likely benefit. **Milani further objects to this Interrogatory to the
extent he does not have to prove that he did not have communications with PNC
Bank, RBC-REFI or the other defendants  to the 2017 lawsuit,  regarding the
same,  other  than  Abraham  as indicated  in these discovery  responses,  by
providing Respondents with the information requested. See *Flax v. Delaware*,
2006 U.S. Dist. Lexis 58293, 2006 WL 2398784 (D. Del**. August 18, 2006); *Gilead
Scis., Inc., v. Merck & Co.*, 2016 U.S. Dist. Lexis 5616, 2016 WL 146574 (N.D. Cal.
Jan. 13, 2016).

The cases cited by Milani are inapposite. In *Flax v. Delaware*, the District Court of Delaware denied

a motion to compel where the producing party denied that the information existed.  Milani is not

denying the information or documents exist, they do in fact exist, but he simply will not produce

them.  As for *Gilead Scis., Inc. v. Merck & Co.*, that case simply stated that "[w]ithout more specific

information triggering some reason for doubt, the Court must take the producing party...at its word."

That rule may apply when a party swears under oath that documents do not exist, but it does not

apply here where the documents and information does exist, but Milani simply refuses to produce

it. As for "specific information triggering some reason for doubt," there will be plenty shown below.

FXM also served the following request for production of documents on Milani to discover

whether, in fact, he had communications with PNC/RBC or any of his co-conspirators. The response

is also shown along with the stated deficiency in the 72-page letter:

**Request No. 36**:  Produce copies of any and all cellular telephone bills and call logs
for service provided on any and all cellular phones you used within the Relevant
Period.

<u>Response</u>:  Debtor objects to Request No. 36 on the grounds that it is vague, unduly burdensome, overly broad, and not calculated to lead to the discovery of admissible evidence.  Debtor further objects to Request No. 36 on the grounds that it is beyond the scope of discovery.

<u>Deficiencies</u>: Mr. Milani's deposition testimony illustrates his bad faith regarding this legitimate request.

    7    Q.  Do you have a cell phone?

    8    A.  Yes, I do.

    9    Q.  What's the number?

    10    THE WITNESS:  That's -- do I need to?

    11    MR. CLAPP:  Go ahead.  Yeah.

    12    THE WITNESS:  (404) 597-4322.

    13  BY MR. MOORE:

    14    Q.  And who is your carrier?

    15    A.  Sprint.

    16    Q.  And how long has Sprint been your carrier?

    17    A.  From beginning.

    18    Q.  And when's the beginning?

    19    A.  Like as long as Sprint -- I have a phone, I

    20  own it, Sprint was the carrier.

    21    Q.  How long has 597-4322 been your telephone

    22  number?

    23    A.  20 years.

    24    Q.  Why won't you produce your phone records to

    25  me?

    1    A.  Say again?

    2    Q.  Why won't you produce your phone records to

    3  me?

    4    A.  I don't need to.  Why I do that?

    5    Q.  So I'll know who you called.

6    A.  You're asking.  I answer you what you need

7  to know.

8    Q.  Oh, I see.  So when you tell me you didn't

9  have any conversations with anybody at RBC Real

10  Estate Finance, Inc., you just want me to accept that

11  as true, right?

12    A.  Yes.

13    Q.  And you're not willing to give me your

14  telephone records to make sure that you're telling

15  the truth, right?

16    A.  You just asked.  I said I don't need to give

17  it to you because you're asking all the questions.

18    Q.  And that's why you're not giving me your

19  phone records, right?

20    A.  We are under oath.  We answer right.  And

21  that's what I'm answering, whatever you ask.

22    Q.  Okay.  So --

23    MR. CLAPP:  Mr. Milani, do you have the

24    phone records for October 20, '17?

25    A.  I don't have.  I mean, I don't have.  Bill

1  comes, I mean.

2    MR. CLAPP:  Right.  So if you don't have

3    them, just say you don't have them.

4    THE WITNESS:  I don't have it.

[Milani Deposition, February 20, 2018 pgs 26-28, Dkt#63-14, pages 8 of 33]. This response is evasive and the objections are frivolous.  Demand is hereby made that, within ten (10) days from the date of our meet and confer, Mr. Milani withdraw his baseless objections and provide any and all documents that Respondents sought in this request.

In the meet and confer session, counsel had the following colloquy:

> MR. MOORE: Right. Thank you. I asked for copies of all cellular telephone bills. Now, again, my understanding is that Mr. Milani keeps those phone bills. He has an accountant. It's not like you and me, you know? We pay them and throw them away.

> MS. HUMNICKY: I'm objecting to that as it's outside the scope again. He's denied that he's spoken to these people, had communications with these people. He doesn't have to prove the negative. He doesn't have to give you his cell phone bills to prove to you that he hasn't spoken to them.

> . . .

> MR. MOORE: No. No, no, no, no. No. You can't -- I mean, information that's discoverable is discoverable, period; okay? You can't have somebody come up here and say, no, and thereby foreclose me being able to get information, like a phone record, that is reasonably calculated to lead to admissible evidence. If only for the purpose of impeaching the man who said, no, he doesn't have them when, yes, he does. Or, no, I didn't call him, and there's the call; so please, please reconsider that position because I don't think it's going to withstand any kind of scrutiny.

> MS. HUMNICKY: I say it's outside the scope. You say it's inside because I need to be able to prove he did have these communications. We're saying he didn't have the communications. He doesn't have to disprove -- he doesn't have to prove the negative, that he didn't have the communications; therefore, he doesn't have to produce the documents.

M&C Transcript, p118. The argument that cellular telephone records are outside the scope of discovery is disingenuous and wholly without merit. This series of interrogatories and request for production of documents is indicative of the positions taken by Milani in all of his initial discovery responses, at the meet and confer session and in his supplemental discovery responses. On **Exhibit 25** attached hereto and incorporated herein by reference ("Updated Deficiency Report"), Respondents provide a detailed account of the status of their discovery, Milani's initial responses, supplemental response [Dkt#82, pp92-135] and the remaining deficiencies. In this motion, Respondents seek an order compelling Milani to provide full and complete responses and to cure the deficiencies as set forth in the Updated Deficiency Report.

7. <u>Milani's Parsimonious Production of Paper</u>. As noted in Respondents' Motion to Compel Discovery [Dkt#63, pg12], in his first production of documents, Milani provided <u>only one piece of paper - a copy of a $50,000 check drawn on Milani's personal bank account and made payable to Balch & Bingham</u> [Dkt#63-12].   Following the M&C Session, Milani did file two supplemental responses to Respondents' request for documents [Dkt#82, pp113-135] and also supplemented his one-page initial paltry production.   Even with such supplementation, however, Milani has continued to refuse to produce many of the documents requested.   Milani's supplemental production consisted of only 136 additional pages broken down into the following categories:

A.    Emails exchanged among Milani's counsel and counsel for some of the other defendants in the 2017 DeKalb Lawsuit (75 pages);

B.    Balch & Bingham heavily redacted invoices (45 pages);

C.    Cohen Pollock Merlin Turner, PC heavily redacted invoices (7 pages); and

D.    Small Herrin, LLP redacted invoices (9 pages).

Notably, documents that were requested, but not produced include, but are not limited to: **(a)** documents relating to agreements he had with the other co-defendants; **(b)** documents evidencing any communications with other co-conspirators; **(c)** income tax returns for Milani, MHB Homes, Portofino, Hadi Homes, or Diamond Island; **(d)** property tax returns for Milani; **(e)** bank records for Milani; **(f)** applications Milani made for loans; **(g)** financial statements for Milani; **(h)** computers (for purpose of obtaining mirror image of their hard drives); **(i)** cellular bills; **(j)** intercompany or internal emails or memos; **(k)** documents relating to the Dock Permits or the transfer thereof; **(l)** documents relating to the Personal Property (a defined term) or the transfer thereof; **(m)** documents supporting the claim asserted by Milani for $800,000 against Respondents; **(n)** passport; and **(o)** appraisals of all or any part of the Lake Lanier Property.

8. <u>The Do-Over of Milani's Deposition</u>. At the conclusion of the meet and confer, counsel

had the following colloquy regarding Milani's second deposition:

> MR. MOORE: I want to know about the deposition. I want his deposition. I want
> him to produce the documents. I want him to give me full and complete answers to
> interrogatories. I want him to come back to Blue Ridge and have a deposition, this
> time without a lawyer whispering in his ear, without a lawyer interrupting, without a
> lawyer provoking me in an attempt to -- with his insults and fighting language. I want
> that to happen.

> MS. HUMNICKY: The only thing that I think you would be able to depose him on is
> documents that we produce after today.

> MR. MOORE: No. I will not accept that condition.

> MS. HUMNICKY: Okay. Then we'll need to let the judge decide. I think otherwise
> he's answered your question.

> MR. MOORE: I want to see the documents he's going to produce because if he
> produces a document that he should produce, then I'll have a very wide range of
> examination in his deposition.

> MS. HUMNICKY: What I think makes sense, then, is that we produce the documents
> that we said we would produce. We give the supplemental responses. We let the
> judge determine what else needs to be produced, if anything. And then we have the
> deposition at my new office.

> MR. MOORE: I will take the deposition at your new office if we can -- if all other
> things are agreed upon. Otherwise, I'm going to stand on my -- I believe that he came
> up to Blue Ridge in bad faith. And I believe he wasted my time. And I think it would
> be appropriate for him to come back up there so I don't have to drive down here. As
> far as --

> MS. HUMNICKY: I have to go.

> MR. MOORE: I know you do, but this is important. I'm not willing to wait. I want
> to get the documents, and when I look at the documents, I will make a decision as to
> whether or not I want to litigate the issues of document production and interrogatory
> responses first, or whether I want to take his deposition. It's entirely possible that I
> may want to retake his deposition, complete his deposition, and then file my motion.
> So -- you know -- I'm entitled to take discovery in any sequence that I want to; so I'm
> not going to bargain at this juncture. But I will talk to you about it after yousupplement and produce.

> MS. HUMNICKY: Okay. I am not going to agree to multiple depositions. I think all
> the documents that are going to be produced need to be produced first. And if we can't
> agree on that, let's go see the judge.

> MR. MOORE: Let's see how it plays out.

MS. HUMNICKY: Okay. Because otherwise I think he answered your questions, and the only thing left is to ask about documents. And why should we keep going back and keep going back and keep going back?

MR. MOORE: Well, the reason we would keep going back, keep going back, keep going back is because he won't produce the documents that he's supposed to produce. And he keeps doing it in installments, which is another one of the classic tactics used.

MS. HUMNICKY: So let's get all the documents produced first.

MR. MOORE: No. I'm not willing to agree to that right now.

MS. HUMNICKY: I think because we know there's going to be arguments over what documents we can produce that question should be answered. The documents should be produced, and then you have a deposition. I'm not going back again and again and again. We're going to do it one more time if we're going to do it.

M&C Transcript, pp 121-128. Construed in a light most favorable to Milani, the net result of this colloquy was that Ms. Humnicky wanted Respondents to hold off on another deposition of Milani until Milani supplemented his discovery responses and produced the discoverable documents requested. And, if further issues were raised about what Milani produced then those issues would first be litigated and only then would Milani agree to a second deposition. After all, Ms. Humnicky did not want to go "back again and again and again." Neither do the Respondents.

## VIII.  Milani's False Testimony & Discovery Responses

### A.    Serial Filer - Serial Perjury

1. Milani's First Bankruptcy Filing. On October 4, 2010, Milani filed his first Chapter 13 bankruptcy petition to stop the foreclosure on his $10 million White House thereby commencing Chapter 13 case number 10-89815-jb. A true and correct redacted copy of that petition is attached hereto as **Exhibit 26**. Even though at the time he owed over $15 million on personal guarantees on loans for the Lake Lanier Project to PNC/RBC and Abraham, Milani sought protection under Chapter 13 and falsely stated under oath that his "[d]ebts [were] primarily consumer debts, defined

in 11 U.S.C. §101(8) as 'incurred by an individual primarily for a personal family, or household purpose.'" While still the owner of the White House, the Bayshore Home, and other valuable real estate, he falsely checked the boxes to indicate that his estimated assets were in the range from $0 to $50,000 and his estimated liabilities were also $0 to $50,000. In his summary of schedules, he falsely stated that he owned real property having a value of $0.00 and personal property having a value of $0.00. He also falsely showed $0.00 for creditors holding secured claims, $0.00 for creditors holding unsecured priority claims, and $0.00 for creditors holding unsecured nonpriority claims. On his Schedule A - Real Property, he averred that he owned "none." On his Schedule B - Personal Property, he also falsely checked the box for "none" on each of the following categories:

13.    Stock and interests in incorporated and unincorporated businesses.

14.    Interests in partnerships or joint ventures.

19.    Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property.

20.    Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust.

35.    Other personal property of any kind not already listed.

He also checked the box that indicated that he had no co-debtors - which was false.

In his Statement of Financial Affairs, Milani also falsely averred that: **(a)** he had no income from employment or operation of business; **(b)** he was involved in no suits, administrative proceedings, executions, garnishments and attachments; and **(c)** that he had no property owned by another person that he holds or controls.

2. Milani's Second Bankruptcy Filing. On March 1, 2011, Milani filed his second Chapter

13 bankruptcy petition to stop the foreclosure on his $10 million White House thereby commencing

Chapter 13 case number 11-56589-jb. A true and correct redacted copy of that petition, prepared by

non-attorney Raquel Cuadrado at a cost of $150 is attached hereto as **Exhibit 27**. Again, and even

though at the time  he owed over $15 million on personal guarantees to PNC/RBC, Milani sought

protection under Chapter 13 and falsely stated under oath that his "[d]ebts [were] primarily consumer

debts, defined in 11 U.S.C. §101(8) as 'incurred by an individual primarily for a personal family, or

household purpose.'" While still the owner of the White House, the Bayshore Home, and other

valuable real estate, he falsely checked the boxes to indicate that his estimated assets were in the

range from $100,001 to $500,000 and his estimated liabilities were also $100,001 to $500,000.

When asked to list "all prior bankruptcy cases filed within the last 8 years," Milani stated "None."

Milani's second bankruptcy case was dismissed in that certain "Order Dismissing Chapter 13

Case Pursuant to 11 U.S.C. Sections 105(a) and 109(g)" (the "2011 Dismissal Order") a true and

correct copy of which is attached hereto as **Exhibit 28**. In that order, the Court wrote:

> In the instant case, the Debtor has failed to file a credit counseling certificate, Chapter
> 13 plan, schedules, statement of financial affairs, statement of current monthly income
> and payment advices pursuant to 11 U.S.C. §521(a)(1). The Debtor also failed to
> appear at the regularly scheduled Meeting of Creditors on April 8, 2011.

Milani's first two bankruptcy cases were filed in bad faith and contained numerous patently false

averments by Milani. But Milani's bad faith abuse of this Court and the Bankruptcy Code did not

stop there.

3. Milani's Third Bankruptcy Filing (This Case). On March 12, 2015, Milani filed his third

bankruptcy petition thereby commencing this Chapter 7 case [Dkt#1]. This time Milani checked the

boxes to indicate that his estimated assets were in the range from $500,001 to $1 million and his

estimated liabilities were $10,000,001 to $50 million [Dkt#1, p1]. On his Schedule A - Real Property, he averred that "Debtor has no real property" [Dkt#1, p14]. On his Schedule B - Personal Property, he also falsely checked the box for "none" on each of the following categories:

13.   Stock and interests in incorporated and unincorporated businesses.

14.   Interests in partnerships or joint ventures.

19.   Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property.

20.   Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust.

[Dkt#1, pp 16-17]. As for the item number 35 in which he was asked to list "[o]ther personal property of any kind not already listed," Milani listed a "[b]eneficial interest in YFM Family Trust" with a value of 0.50 [Dkt#1, p17]. In this filing, Milani gave a different answer then the checked box indicating "none" in his 2011 petition to the following question:

> If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the business, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

[Dkt#1, p35]. In his 2015, Milani provided the following information:

| Name | Taxpayer ID | Address | Nature of Business | Beginning and Ending Dates |
|---|---|---|---|---|
| International Church of God, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Church | 2001-2010 |
| Milani Estates, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 2003-2011 |
| Oak Grove Estates, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 2003-2014 |

| Milani Properties, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 1994-2010 |
|---|---|---|---|---|
| Milani Service Company | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 1995-2012 |
| Milani Homes, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 1996-2012 |
| Hadi Homes, Inc. | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 1997-Present |
| Victory International Church, Inc. | None given | 4980 Pitman Road | Church | 2007-Present |
| Portofino at Lake Lanier, LLC | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 2005-2014 |
| MHB Homes, LLC | None given | 1510 Oak Grove Rd. Ste 2 | Real Estate Construction | 2005-Present |

Respondents contend that this list is incomplete for several reasons. First, it does not include Milani's interest in, among other potential entities, Diamond Island, LLC, Diamond Cementer, LLC, Atlanta White House, LLC, or **MLH Homes, LLC**. That MLH Homes, LLC should have been included in Milani's schedules and statements seems pretty clear given documents in the public record.

**B.    Milani's Ability to Accumulate "After-Acquired Property" on $50k Annual Income**

1. 2267 Echo Trail - $1.3 Million. According to the documents attached hereto as **Exhibit 29**, MLH Homes, LLC (believed to be owned by Milani, X-Lu and Sirous Hadi) was formed on February 23, 2010. At the time he filed this case, Milani gave as his rental address 2267 Echo Trail, NE, Atlanta, Georgia 30345 ("2267 Echo Trail") for which, according to his schedules, Milani was paying **$500 per month in rent** [Dkt#1, p31]. According to the 2015 tax statement attached hereto as **Exhibit 30**, that property was valued by the DeKalb Tax Assessor at **$1,232,400** for ad valorem tax purposes  - a valuation that is typically at least 20% to 30% below fair market value. Notably, at the time of his filing, the owner of 2267 Echo Trail was none other than MLH Homes, LLC - and

the public records do not show any mortgage or security interest on 2267 Echo Trail at the time Milani filed his third bankruptcy.

In December 2015 and within just a few months after he obtained his discharge, MLH Homes, LLC conveyed 2267 Echo Trail to Milani and his wife as joint tenants with the right of survivorship in a deed (**Exhibit 31**) that recited that the transfer was being made "for and in consideration of LOVE AND AFFECTION and other good and valuable consideration." Signing on behalf of MLH Homes, LLC was Milani's partner in at least one other entity, Hadi Homes, LLC, Sirous Hadikapourchali (aka Sirous Hadi). Not only did MLH Homes, LLC rent and then convey 2267 Echo Trail to Milani, but it also took back a purchase money security deed (**Exhibit 32**) for $950,000. One is left to wonder how a home worth $1.5 million would be sold to a recent bankrupt who was able to come up with $550,000 in cash and financing of $950,000.

But that is not the end of the story, within 5 days after he got served with the 2017 DeKalb Lawsuit, MLH Homes, LLC - with Fred Milani signing as its "Manager" recorded a "Cancellation of Security Deed" (**Exhibit 33**) thereby extinguishing the purchase money loan that Milani had obtained to acquire 2267 Echo Trial. A Warranty Deed recorded in the deed records in <u>March 2012</u> has Milani signing in the capacity of "member" of MLH Homes, LLC (**Exhibit 34**). Later in December 2015, Mrs. Milani conveyed her interest in 2267 Echo Trail to Milani who then became the sole owner of that property (**Exhibit 35**).

As for whether Milani had an interest in MLH Homes, LLC prior to bankruptcy, that company was featured in an article appearing in the Fall 2014 edition of "The City of Doraville Insight" [**Exhibit 36**] that included the following:

The Chestnut Place properties are being built by **MLH Homes, LLC**. The six units

receiving permits in July were in addition to six other units that started construction in early 2014. **MLH Homes is a division of Milani Homes**, a premiere construction company that has been building luxury homes in Atlanta for 25 years. **Owner Fred Milani** is perhaps best known for his own personal residence that he built as a replica of the White House, located on Briarcliff Road near Northlake.

Thus, when Milani filed his 2015 bankruptcy petition he just happened to be living in (renting?) a home owned by a limited liability company in which he was a member - a home that was mortgage free at the time of the filing. Milani also checked the box that indicated that he had no co-debtors [Dkt#1, p28] - which was false.

2. Bayshore Home - $640k. Milani also seems to have done an amazing job post-bankruptcy in acquiring million dollar properties even though he has sworn that his reported income was essentially $50,000 per year beginning in 2014 and continuing through 2017 [See Dkt#1, p6 and Milani Depo. (February 20, 2018), at p. 104, Dkt#63-14]. Prior to bankruptcy, Milani owned the Bayshore Home presently valued by the local taxing authority at $640,000 (**Exhibit 37**). In June 2013, the Bayshore Home was sold by PNC Bank at foreclosure and the high bidder was none other than **Iraj Jake Nadjmazhar** with an address given as 1965 Carlotta Court, Atlanta, Georgia 30345 (**Exhibit 38**). By deed dated December 16, 2015 - i.e. after Milani received his discharge - his buddy/relative Jake was kind enough to re-convey the Bayshore Home to Milani (**Exhibit 39**). Current tax records show Milani as the sole owner of the Bayshore Home. Perhaps coincidentally, Jake shares an address in the same Atlanta subdivision (developed and built out by Milani) called Oak Grove Preserve. Cozy!

## C.   Milani's Involvement in Portofino 2.0 (the 2017 Version)

Milani never relinquished his hold on and control of the Lake Lanier Property and the

subdivision that he envisioned for that special lake front property. That is evident by Milani's effort

to revive and keep moving on with his project - after he believed that his collusive foreclosure

scheme rid him of the FXM Attorney Lien and his personal bankruptcy, in his mind, immunized him

from FXM forever. Even though Milani and his attorney have repeatedly stated that Milani had

nothing to do with the Lake Lanier Property after it was foreclosed on in 2014, those statements are

patently false based on publically available documents.

In what are captioned as "Site Development Plans for Portofino Subdivision" dated October

14, 2016, Diamond Island, LLC calling itself the "Owner/Developer," submitted plans to the Hall

County planning department. Several pages of that submission are attached as **Exhibit 40** on which

information is highlighted and comments appear in red ink. The submission includes the name

"Milani Homes" on it and states that the contact person is Milani's partner and the licensed builder,

Sirous Hadi with an address of 1510 Oak Grove Road, Suite 2 and a cell number of 404-597-4323.

Milani's cell number is 404-597-4322 (i.e. only one digit off Mr. Hadi's). Also, the address given

for the contact Also included as an email address for contact is milanihomes@bellsouth.net. That

is the email address that FXM used to send hundreds of emails to Fred Milani during the nearly five

years it represented him and his entities. Contrary to Milani's sworn testimony that the very valuable

Dock Permits were foreclosed on by RBC in February 2014, that is simply untrue. Yet those same

Dock Permits are now being held in the name of Diamond Island, LLC. That could not have

possibly happened without action by Milani on behalf of Portofino and MHB Homes. Again, Milani

has repeatedly lied about his knowledge of the transfer of the Dock Permits to Diamond Island.

**D.    Milani Committed Perjury in Denying he Does Business with X-Lu**

Diamond Cementer was the entity that loaned Jacquelyn Reese the money to buy the White

House on the Courthouse steps for approximately $1.2 million. Milani told Moore that X-Lu had given Reese - as strawman for Milani - the money to buy the White House. Respondents contend that Milani owns and controls Diamond Cementer, even though Milani has tried mightily to make it appear that Diamond Cementer is owned - not by Milani - but by X-Lu. What makes this unlikely, however, is Milani's adamant testimony and discovery responses in which he denies that he has done any business with X-Lu since the Lake Lanier Property was foreclosed on in early 2014. One way or the other, Milani is again lying through his teeth.

Diamond Cementer has been very active in developing another Lake Lanier development in Forsyth County in a subdivision called Diamond Garden on Lake Lanier. Public record documents dated from and after September 2016 and current internet marketing materials attached as composite **Exhibit 41** reflect Milani's clear control and involvement with X-Lu and Y-Lu in that development. First of all, the address given on the permit application documents for Diamond Cementer, LLC is 1510 Oak Grove Road, Decatur, Georgia - the same business address for all of the companies listed by Milani in his bankruptcy schedules filed in this case. [See, e.g. Exhibit 41, Pages 1, 2, 3]

The NPDES General Permit application is signed by Yueling Lu, calling himself a member of Diamond Cementer, LLC. [Page 3] In the Notice of Intent completed by the Tertiary Permittee, the contact person is shown as Fred Milani [Page 5], and the signature of the Owner is that of Yueling Lu, calling himself a "member" and the Operator is shown as MLH Homes, LLC, with Sirous Hadi signing as its "manager (sic) member." [Page 7] The check given for the permit application fee was dated August 12, 2016 and drawn on the account of MLH Homes, LLC the address for which is shown on the check as being 1510 Oak Grove Road, Ste 2, Decatur, Georgia. [Page 8] On a document captioned as "Site Development Plans for Diamond Garden on Lake Lanier

Amenity Site" the 24 Hour contact is shown as "Fred Milani" beneath which it states "Developer: Diamond Cementer, LLC. [Page 9] In online marketing materials, Milani Homes is described as the "boutique builder." [Page 10]. And a $5 million home in Diamond Garden is described as "New Construction by Milani Homes, boutique builder of over 680 homes inside Atlanta." [Page 14]

In short, Milani has grossly misrepresented his involvement with X-Lu and Y-Lu in sworn testimony that is completely contradicted by publically available documents. Milani wants the Court to apply the principle set forth in *Gilead Scis., Inc. v. Merck & Co.* that "[w]ithout more specific information triggering some reason for doubt, the Court must take the producing party...at its word." Respondents have demonstrated that Milani has repeatedly and knowingly perjured himself. At the very least Respondents have come forward with "more specific information triggering some reason for doubt," meaning that when Milani denies that he communicated with or entered into agreements with different entities or persons, Respondents are entitled to demand the production of information that will either corroborate or refute Milani's statements under oath.

Attached hereto as **Exhibit 42** is the certificate of counsel required by Federal Rule of Bankruptcy Procedure 7037 and Federal Rule of Civil Procedure 37(a)(1).

## IX.  ARGUMENT & CITATION TO AUTHORITY

## A.    This Court's Contempt Powers

There are numerous sources for a court's power to sanction a litigant by, among other things, awarding the opposing party its attorneys fees.  11 U.S.C. §105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

28 U.S.C. § 1927 is another independent source under which a federal court allows for attorneys fees to be awarded for unreasonable and vexatious multiplication of proceedings. A source of guidance for the manner in which the generally expressed powers of these statutes can be found in the remedies available under: **(1)** Fed. R. Civ. Pro. 11(c)(4)[6] which provides that attorneys fees may be awarded for, among other reasons, **(a)** when pleadings were presented for improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; or **(b)** when the claims or defenses are frivolous: or **(2)** Fed. R. Civ. Pro. 37(c)(1)(A) & (d)(3) under which attorneys fees may be awarded for failure to disclose discoverable information, attend deposition or failure to respond to interrogatories or requests for production of documents.

Further authority for the award of sanctions in the form of attorneys fees resides in the court's inherent power derived from its need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v Nasco, Inc.*, 501 U.S. 32, 43 (1991). The "inherent

---

[6]  Respondents have not filed this motion pursuant to Fed. R. Civ. Pro. 11 which has pre-requisites that must be met before fees can be awarded under that Rule.  Courts with such broadly expressed powers as are set forth in 11 U.S.C. §105 or 28 U.S.C. §1927 frequently look to the sanctions available under Rule 11 as guideposts.

power of a court can be invoked even if procedural rules exist which sanction the same conduct."

*Chambers*, 501 U.S. at 46. "The key to unlocking a court's inherent power is a finding of bad faith."

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). "Bad

faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of

justice has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous

argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Quantum*

*Communications Corp. v. Star Broad, Inc.*, 473 F. Supp. 2d 1249, 1268-1269 (citations omitted).

Knowingly false or misleading statements made to the court constitute fraud on the court

sufficient to justify the imposition of sanctions.  See, *In re: Amtrak "Sunset Limited" Train Crash*

*in Bayou Canot, Alabama On September 22, 1993*, 136 F. Supp. 2d 1251, 1269-1270 (S.D. Ala.

2001); *Young v. Office of the U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 71 (D.D.C. 2003)(Lying

cannot be condoned in any formal proceeding . . .. Our legal system is dependent on the willingness

of the litigants to allow an honest and true airing of the real facts.").  See also, *Zubulake v UBS*

*Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003); *In re the Prudential Insurance Company of*

*America Sales Practices Litigation*, 169 F.R.D. 598 (D. N.J. 1997); *U.S. v. Philip Morris USA, Inc.*,

327 F. Supp. 2d 21 (D.D.C. 2004); *Kipperman v. Onex Corporation*, 2009 WL 1473708 (N.D. Ga.

2009).

In *Chambers v Nasco*, a party had engaged in what was alternately described as: **(a)** acts

which degrade the judicial system; **(b)** attempts to deprive the court of jurisdiction by acts of fraud;

**(c)** false and frivolous pleadings; **(d)** tactics of delay, harassment, and massive expense designed to

reduce [their opponent] to exhausted compliance; **(e)** conduct which abuses the judicial process; **(f)**

disruption of court proceedings; and **(g)** tampering with the administration of justice.  Respondents

respectfully submit that all of those terms describe the actions of Milani in filing and prosecuting his

baseless Motion for Contempt against Respondents and, after being caught in a web of deceit,

compounding their misconduct by repeatedly lying under oath and obstructing discovery.

The Second Circuit dealt with similar circumstances in *Meyerson v. Werner*, 683 F.2d 723,

728 (2nd Cir. 1982).  In *Meyerson*, it was determined that a bankruptcy petition was a sham to evade

a district court's order and recognized the principal's "long record of willful, contemptuous and

contumacious behavior." Id. at 728.  The Second Circuit held:

> We recognize that ordinarily the filing of a bankruptcy petition automatically stays an
> ongoing suit or the enforcement of a previously obtained judgment. 11 U.S.C. § 362.
> We do not believe, however, that § 362 was intended to deprive a federal court of
> jurisdiction to deal with circumstances such as these. In view of this long and
> extraordinary history of misconduct, which clearly demonstrated that Cook filed the
> sham Chapter XI petition in a bad faith, vexatious and contemptuous effort to violate
> the district courts' prior orders, the court was entitled under its inherent power under
> the All Writs Act, 28 U.S.C. Sec. 1651 to enjoin such an attempt to defeat the court's
> orders by resorting to frivolous litigation elsewhere.

Indeed, this case fits the paradigm of both *Meyerson* and *Chambers*, thereby authorizing the Court

to enter an order which, among other things, authorizes Respondents to recover sanctions in the form

of attorneys fees related to their defense against these proceedings and their unlawful attempts to oust

or interfere with the DeKalb Superior Court's jurisdiction with such award being entered against

Milani and Mr. Clapp, jointly and severally, and grants such other and further relief as may be just

and proper.

**B.    Milani Should Be Compelled to Provide Discovery**

Federal Rule of Civil Procedure 37, made applicable to contested matters by operation of Federal Rules of Bankruptcy Procedure 7037 and 9014, provides: "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1); see also Fed. R. Bankr. P. 7037. Respondents seek an order compelling the Debtor to appear for a deposition, to provide full and complete responses to interrogatories, requests for production and requests for admissions, and to produce the documents requested.   An attempt to confer in good faith (attached hereto as Exhibit 42), verified by certificate pursuant to Fed. R. Civ. P. 37(d)(1)(B), is sufficient to satisfy the good faith conferral requirement. See, *In re Bello*, 528 B.R. 562, 568 (Bkrtcy. E.D.N.Y., 2015).

In determining whether a party has failed to answer or produce, a court should treat evasive or incomplete answers or disclosures as failures. Fed. R. Civ. P. 37(a)(4). Here, Milani asserted frivolous objections, failed to provide full and complete responses to Respondents' interrogatories, requests for documents and requests for admissions, and failed to  produce virtually any of the documents legitimately and reasonably requested by Respondents.  Milani made unwarranted and, in some instances, nonsensical, general objections, thereby making those responses  evasive and incomplete. See *Heller v. City of Dallas*, 303 F.R.D. 466, 483 (N.D. Tex. 2014); *U.S. Commodity Futures Trading Comm'n v. Am. Derivatives Corp.*, 2007 WL 1020838, at *3 (N.D. Ga. Mar. 30, 2007). Respondents seek an order compelling Milani to: (a) provide full and complete answers to the interrogatories, requests for production of documents and requests for admissions; (b) produce all of the responsive documents that are not privileged; and (c) provide a privilege log in a form that complies with the rules and laws regarding same.

**C.    Milani Should Be Made to Appear Again For his Deposition**

A court may order a party to attend a second deposition where the party's conduct impeded the successful completion of the original deposition. See *Isaac v. RMB, Inc.*, 604 F. App'x 818, 821 (11th Cir. 2015) (per curiam) (citing Fed. R. Civ. P. 37(a)(3)(B)(i)).   Milani surprised the Respondents by sandbagging them on where or whether his deposition would proceed and by failing to produce, prior to his deposition, anything but one single piece of paper.  In addition to these failures, the rampant misconduct by Milani and Mr. Clapp made it impossible for Respondents to obtain the information to which they were entitled.  Should Milani fail to appear and testify truthfully and without feigning broken English and an inability to read and without unwarranted and improper obstruction by his counsel, Respondents request the right to sanctions pursuant to Rule 37(d)(1)(A).

## D.   Respondents Are Entitled to Recover Costs and Expense for Filing this Motion

In addition to its contempt powers, under Rule 37 the Court may consider whether to impose the costs of bringing the instant motion on the Milani or his counsel. See Fed. R. Civ. P. 37(a)(5)(A) ("If the motion is granted…the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.").  The Court may not impose costs if "(i) the movant filed the motion before attempting in good faith to obtain disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A). Respondents respectfully request that the Court award all fees and costs incurred by Respondents to the fullest extent allowed under the Rules and the law.

## X. CONCLUSION

Respondents hereby respectfully request that the Court, for all the reasons set forth herein, enter an order granting all the relief requested herein and such other and further relief as is just and proper.

Respectfully submitted, this 5th day of December 2018.

**FRANK X. MOORE LAW**

*/s/ Francis X. Moore*

Francis X. Moore

Georgia Bar No. 519120

730 E 2d Street,  Suite 106

Blue Ridge, Georgia 30513          Counsel for Respondents, FXM, P.C. d/b/a

706-851-7946                               Frank X. Moore Law and Francis X. Moore

fmoore@fxm-law.com

## CERTIFICATE OF SERVICE

I hereby certify that service of this pleading will be accomplished by email sent by the undersigned and by Pacer eservice to the following parties at their email address on file with the Court:

M. Denise Dotson, Chapter 7 Trustee

**M. Denise Dotson, LLC**

PO Box 435

Avondale Estates, GA 30002

ddotsonlaw@me.com

Anna M. Humnicky, Esq.

Benjamin S. Klehr, Esq.

**Small Herrin, LLC**

Two Paces West, Suite 200

2727 Paces Ferry Road

Atlanta, Georgia 30339

ahumnicky@smallherrin.com

bklehr@smallherrin.com

and by placing a copy hereof on a flash drive and depositing it in the U.S. Mail, first class postage prepaid and addressed to the following:

Office of the United States Trustee

362 Richard Russell Building

75 Spring Street, SW

Atlanta, Georgia 30303

This 5th day of December 2018.

*/s/ Francis X. Moore*